# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

Jacob Root
*Plaintiff-Appellant.*
v.
Officer Robert Comstock, et al.
*Defendant-Appellees.*

On Appeal from
The United States District Court
**District of Colorado**
The Honorable
Judge Daniel D. Domenico
District Court Case No.:
1:24-cv-01293-DDD-TPO

OPENING BRIEF OF APPELLANT

Oral Argument Requested

Law Offices of Harry M. Daniels, LLC    JOLLY LAW, P.L.L.C

Harry M. Daniels, Jr.                    Tyler A. Jolly, #52361
Georgia Bar 234158                       9996 W U.S. Highway 50, Unit 1090
4751 Best Rd. Suite 490                  Salida, CO 81201
Atlanta, Georgia 30337                   Phone: 719-429-7359
Telephone: (678) 664-8529                Tyler@jollylawcolorado.com
Facsimile: (800) 867-5248
daniels@harrymdaniels.com

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

TABLE OFAUTHORITIES...........................................................................iii

STATEMENT OF RELATED APPEALS.................................................6

JURISDICTIONAL STATEMENT..........................................................6

STATEMENT OF ISSUES..........................................................................7

STATEMENT OF THE CASE.....................................................................7

    A.    Parties....................................................................................7

    B.    Statement of Facts...............................................................8

SUMMARY OF THE ARGUMENT........................................................22

STANDARD OF REVIEW.........................................................................23

ARGUMENT.................................................................................................24

I.     The district court committed reversible legal error by impermissibly applying what amounted to a heightened pleading and construing facts in the light most favorable to the moving party at the motion to dismiss stage...............24

II.    The district court made an error in concluding that the Appellant failed to sufficiently present a claim against the City of Colorado Springs, specifically regarding a custom that directly connects that custom to the injury claimed by Mr. Root...............................................................................................27

III.   The district court erred by neglecting to recognize that using a taser on an unarmed, non-threatening individual in an elevated/vulnerable position constituted excessive force, thereby violating the Appellant's Fourth Amendment rights........................................................................................29

A.  Appellant Comstock is Not Entitled to Qualified Immunity at the Motion to Dismiss Stage....................................................29

B.  Reasonableness test in excessive force cases....................32

C.  Tasing a person in an elevated position or a location where a fall may cause substantial injury or death was forbidden and constitutionally unreasonable......................................................................34

CONCLUSION.......................................................................................43

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT................................43

CERTIFICATE OF COMPLIANCE......................................................44

CERTIFICATE OF DIGITAL SUBMISSION........................................45

NOTICE OF ATTACHMENT ...............................................................45

CERTIFICATE  OF SERVICE ...............................................................46

COPY OF DECISION UNDER REVIEW...............................................46

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Creighton*, 483 U.S. 635 (1987............................................30

*Anderson v. Blake*, 469 F.3d 910 (10th Cir. 2006)..................................32

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ..............................................31

*Ashcroft v. Iqbal,*  556 U.S. 662 (2009....................................23, 24, 25, 41

*Baker v. Union Twp*., 587 F. App'x 229 (6th Cir. 2014).......................34, 36, 39, 40

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................23, 24, 41, 42

*Bradley v. Benton*, 10 F.4th 1232, 1237 (11th Cir. 2021) ................................ 39, 43

*Brosseau v. Haugen*, 543 U.S. 194 (2004)............................................................31

*Brown v. Montoya*, 662 F.3d 1152  (10th Cir. 2011)............................................25

*Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007...................31, 32

*City of Canton v. Harris*, 489 U.S. 378 (1989)....................................................29

*Cook v. Riley*, No. 11-cv-24, 2012 WL 2239743, at *12

(M.D.N.C. June 15, 2012........................................................................................38

*Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009))................................34, 41, 44

*District of Columbia v. Wesby*, 583 U.S. 48 (2018)..............................................31

*Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008)....34, 44

*Estate of Melvin v. City of Colo. Springs*, 2023 U.S. App. LEXIS 32622

(10th Cir. Dec. 11, 2023) (unpublished)................................................................30

*Gambrel v. Knox County*, 25 F.4th 391, 401 (6th Cir. 2022)................................40

*Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006)........................................32

*Graham v. Connor*, 490 U.S. 386 (1989)........................................................31, 33

*Harper v. Perkins*, 459 F. App'x 822 (11th Cir. 2012)..........................................39

*Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004)....................................35

*Martin v. City of Reading*, 118 F. Supp. 3d 751 (E.D. Pa. 2015)....................36, 37

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)........................................23, 29

*Moore v. Guthrie*, 438 F.3d 1036 (10th Cir.2006)............................................25, 28

4

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015)...............................................32

*Myers v. Okla. Cnty. Bd. of Cnty. Com'rs*, 151 F.3d 1313 (10th Cir. 1998)...........29

*Negron v. City of New York*, 976 F. Supp. 2d 360, 368 (E.D.N.Y. 2013)...........37

*Peabody v. Perry Twp*., No. 10-cv-1078, 2013 WL 1327026, at *5-7
(S.D. Oh. Mar. 29, 2013).........................................................38

*Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016)..............................31, 32

*Peroza-Benitez v. Smith*, 994 F.3d 157 (3d Cir. 2021)..........................36

*Phillips v. Comm. Ins. Corp*., 678 F.3d 513, 528 (7th Cir. 2012).........................32

*Phillips v. James*, 422 F.3d 1075 (10th Cir. 2005)..............................34

*Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)........................33

*Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020)..................41

*Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)..............................40

*Rockwell v. Rawlins*, No. 13-cv-3049, 2014 WL 5426716, at *4
(D. Md. Oct. 23, 2014).........................................................37

*Ryder v. City of Topeka*, 814 F.2d 1412 (10th Cir. 1987)......................34

*Scott v. Harris*, 550 U.S. 372 (2007).......................................27

*Snauer v. City of Springfield*, No. 09-cv-6277, 2010 WL 4875784, at *5
(D. Or. Oct. 1, 2010).........................................................38

*Tennessee v. Garner*, 471 U.S. 1  (1985)..........................................34, 35

*Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021)...................24, 27, 31

*Wilson v. Layne*, 526 U. S. 603 (1999) …........................................................31, 33

STATUTES

42 U.S.C. § 1983..................................................................6, 28, 29 30, 36

Colo. Rev. Stat. § 13-21-131...................................................................6

28 U.S. Code § 1291.............................................................................7

Model Penal Code § 3.11(2)...................................................................39

**STATEMENT OF PRIOR OR RELATED APPEALS**

None.

**JURISDICTIONAL STATEMENT**

Appellate Jacob Root brought an action against Appellees Officer Robert Comstock, in his individual capacities, alleging excessive force against Officer Comstock under 42 U.S.C. § 1983 and Colo. Rev. Stat. § 13-21-131. Plaintiff also brought a claim against the City of Colorado Springs for custom, policies, practices, and ratification of excessive force under 42 U.S.C. § 1983. All Appellees moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) on all claims on July 29, 2024. On March 3, 2025, the district court issued an order finding that Appellee Comstock was entitled to qualified immunity on excessive use of force under 42 U.S.C. § 1983. Additionally, the district court dismissed the Appellant's claim against the City of Colorado Springs for failure to state a claim pursuant to FRCP

12(b)(6). The district court chose not to adjudicate the Appellant's state law claims for lack of jurisdiction after dismissing the Appellant's federal claims. The Appellant filed his timely notice of appeal on March 28, 2025. This Court has jurisdiction pursuant to 28 U.S. Code § 1291.

## STATEMENT OF THE ISSUES

A. Did the district court committed reversible error by impermissibly applying what amounted to a heightened pleading and construing facts in the light most favorable to the moving party at the motion to dismiss stage?

B. Did the district court incorrectly conclude that using a Taser on an unarmed, non-threatening individual in a vulnerable position did not amount to excessive force, thereby violating the Appellant's Fourth Amendment rights?

C. Did the district court err by expecting the Appellant to undertake a "scavenger hunt" for previous cases with identical facts, rather than focusing on whether the law clearly indicated to officials that the conduct in question was unconstitutional?

## STATEMENT OF THE CASE

### A. Parties

At all times pertinent to the subject matter of this litigation, Appellant Jacob Root (hereinafter Appellant or Mr. Root) was a citizen of the United States of America and a resident of, and domiciled in, the State of Colorado. Appellee City of Colorado Springs, Colorado, is a municipality organized under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. §1983. The Colorado Springs Police Department ("CSPD") is a law enforcement agency that is part of the

City of Colorado Springs. Appellee City of Colorado Springs is responsible for the oversight, supervision, discipline, and training of CSPD officers including Appellee Robert Comstock. At all relevant times, Appellee Robert Comstock (hereinafter Appellee Comstock) was a citizen of the United States and a resident of, and domiciled in, the State of Colorado. At all times pertinent, Appellee Comstock was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer, and Appellee Comstock was employed by the Colorado Springs Police Department.

B.     Statement of Facts

On May 16, 2022, thirteen law enforcement officers across three agencies (Colorado Springs Police Department, El Paso County Sheriff's Office, and Colorado State Patrol) were working together as part of the "BATTLE" (Beat Auto Theft Through Law Enforcement) task force. Appellee Comstock  was working as a member of the BATTLE task force as part of the Colorado Springs Police Department. App. Vol. I, at 8. The task force officers had received a report that a 2017 Ford Fusion had been stolen about 10 days prior on May 6th, 2022. The complaining witness alleged that her car was stolen from a parking lot near her home sometime during the night of May 6th. The complaining witness informed law enforcement that she had left the car unlocked with a key fob inside. *Id*. at 9.  On May 16, 2022, members of the task force discovered the 2017 Ford Fusion in the

parking lot of the Super 8 Motel at 1790 Aeroplaza Dr. in Colorado Springs. The Ford Fusion was unoccupied. *Id*. Rather than recover the unoccupied car, the task force members affixed a tracking device to the car. Thereafter, task force members followed the Ford Fusion to a Kum & Go gas station at 3208 North Nevada Ave. and then to the Aspen Lodge Hotel at 3990 North Nevada Ave. *Id*. Once at the Aspen Lodge, task force members located the Ford Fusion, which was again unoccupied. Rather than seize the unoccupied car, task force members waited for the driver to return and enter the car. *Id*. At that point, task force members drove multiple vehicles into the parking lot of the Aspen Lodge. The task force members attempted to block the car from leaving the parking lot. However, Colorado Springs Police Officer Leigh Avila described the Ford Fusion being able to get around her police cruiser, colliding and causing damage to her front passenger bumper in the process. The task force officers did not immediately pursue the Ford Fusion. *Id*. Officers later tracked the Ford Fusion to a Kum & Go gas station at 2588 Airport Road in Colorado Springs. Upon arrival, the Ford Fusion was parked on the east side of the building and Mr. Root was inside the car. *Id*. at 10. Officers watched Mr. Root get out of the car and enter the gas station. While Mr. Root was in the gas station, the task force members surrounded the building and parking lot. The task force officers did not enter the gas station while Mr. Root was inside. *Id*. Appellee Comstock parked his car at the southwest corner of the gas station and walked towards the front entrance

to the gas station. *Id*. Mr. Root exited the gas station holding a ½ gallon of milk in his hand. Upon seeing the officers, Mr. Root began to run past the gas pumps and towards the sidewalk on Airport Road. *Id*. As Mr. Root was running, Colorado State Patrol Detective Wolff shot at Mr. Root with a "Bola Wrap." Meanwhile, Appellee Comstock began to chase Mr. Root on foot. *Id*. Appellee Comstock drew his TASER weapon while chasing Mr. Root from behind in the gas station lot. Mr. Root then began running down the elevated slope dividing the gas station from the sidewalk on Airport Road. The slope dividing the gas station from the sidewalk was covered in dirt and uneven rocks. *Id*. Appellee Comstock pointed his TASER weapon at Mr. Root's back as he ran down the slope. Then, without warning Mr. Root that he would use his TASER weapon, Appellee Comstock shot Mr. Root in the back. *Id*. Mr. Root experienced muscular incapacitation upon being shot with the TASER. Mr. Root, who could not use his hands or arms to break his fall, fell head-first down the decline, across the sidewalk, and off the curb down into the street. *Id*. at 11. Mr. Root remained face down in the street, face bloodied and groaning in agony, as officers surrounded him and placed him in handcuffs. Mr. Root, who broke his neck during the fall, told the officers as they handcuffed him that he could not move. *Id*. Mr. Root did not have any weapon at the Kum & Go gas station. Mr. Root did not make any verbal threat that he was armed or that he intended to use force against any officer or other person at the Kum & Go gas station.

Mr. Root did not use or attempt to use force against any officer or other person at the Kum & Go gas station. Mr. Root was running away from Appellee Comstock when he was shot in the back. *Id*. As a result of being tased in the back while in an elevated position and experiencing  muscular incapacitation,  Mr. Root was unable to use his hands or arms to break his fall.  Mr. Root's neck was broke rendering him a complete quadriplegic.[1] *Id.*

The Colorado Springs Police Department Standard Operating Procedures-DL-705-01 Conducted Electrical Weapons (CEW)-Section 700 -Force, Detention, and Arrest (Active 5/4/2020) states:

> Absent exigency or supervisor approval, officer or marshal ***will not deploy CEW when a person is in an elevated position or a location where a fall may cause substantial injury or death***. *Id* at 52. (emphasis added)

Mr. Root's injuries include but are not limited to: quadriplegia, loss of constitutional and federal rights, physical injuries, impairments and disfigurement, great pain and emotional distress, and/or aggravation of pre-existing conditions, and ongoing special damages medically/psychologically related treatment caused by the unconstitutional and moving forces concerted conduct of all the Defendants. Mr. Root also continues to suffer ongoing emotional distress, with significant PTSD-

---

[1] **Complete quadriplegic**. This means whatever causes the quadriplegia blocks all signals from getting through. That means a person loses muscle control, the ability to feel sensations and their brain can't manage any automatic processes that rely on brain signaling to work. See https://my.clevelandclinic.org/health/symptoms/23974-quadriplegia-tetraplegia

type symptoms, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares and flashbacks from this unlawful use of force. *Id.*at 11.

Appellee Colorado Springs is municipally liable for Appellee Comstock's actions and has a custom and practice of using and ratifying excessive force. It has long been the custom and actual practice of CSPD to engage in, encourage, and condone the use of excessive force by CSPD officers. *Id.*at 12. Colorado Springs did not terminate or discipline Appellee Comstock for his actions against Mr. Root. Further, CSPD did not recommend any further training or counseling for Appellee Comstock, despite his actions against Mr. Root. *Id.* Colorado Springs' and the CSPD's official position regarding the shooting of Mr. Root in the back, causing him to fall and break his neck, was and is that Appellee Comstock's actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices and training of the City of Colorado Springs and the CSPD. *Id.* This ratification of the conduct that caused Mr. Root's quadriplegia is not alleged as proof that this ratification itself "caused" Mr. Root's injuries. *Id.* Rather, it is evidence that the conduct was engaged in pursuant to policy, custom, and practice of the CSPD. *Id.* Had Appellee Comstock's actions been outside of the policy, disciplinary or remedial action would have been taken. *Id.*

Appellee Comstock acted intentionally, knowingly, willfully, wantonly, maliciously and/ or recklessly in disregard to Mr. Root's federal protected rights and

acted under the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Appellee Colorado Springs acting under color of state law. *Id.* at 13. The custom and practice of excessive force is evidenced by a considerable number of other events, as detailed in at least the following examples:

De'Von Bailey

In 2019, CSPD officers shot and killed De'Von Bailey, a 19-year-old. Mr. Bailey was shot in the back as he ran from officers. The officers involved gave orders for Mr. Bailey to stop running, but the officers gave no warning that they intended to shoot nor use deadly force against Mr. Bailey as he ran away. Multiple witnesses stated that Mr. Bailey did not look back toward the officers, nor did Mr. Bailey make any threatening gesture or motion towards the officers as he ran away. Nevertheless, the officers shot Mr. Bailey in the back. The CSPD's official position was that the conduct of the officers involved in shooting Mr. Bailey in the back was appropriate, consistent with, and engaged in pursuant to all approved police policies, practices, and training of the City of Colorado Springs and the CSPD. Despite the position of the CSPD, the City of Colorado Springs agreed to settle with the estate of Mr. Bailey for nearly 3 million dollars. *Id.*

Dalvin Gadson

On October 9, 2022, CSPD officers violently beat Dalvin Gadson, a homeless United States veteran. Mr. Gadson was stopped by CSPD officers for failing to

display a license plate on his vehicle. However, when Mr. Gadson questioned why he was being told to get out of the car, CSPD officers attempted to physically remove him from the car. The CSPD officers did not provide any warning of their intention to use physical force against Mr. Gadson. The CSPD officers proceeded to punch and knee Mr. Gadson more than twenty times. Mr. Gadson suffered a traumatic brain injury as a result of the excessive force by the CSPD officers. However, the Colorado Springs Police Department asserted that the officers involved had not violated any CSPD policy, and the officers remained in good standing with CSPD. Nevertheless, the City of Colorado Springs has agreed to pay 2.1 million dollars as a settlement in Mr. Gadson's case. *Id.* at 13-14.

Tyrone Moss

On March 12, 2022, CSPD officers responded to a reported disturbance at Wood's Bar and Grill. Once there, the CSPD officers began investigating a man in a white hoody who was allegedly in possession of a firearm. That person was not Mr. Moss, and CSPD officers had no evidence that Mr. Moss was engaged in any crime. Mr. Moss was near the scene of the investigation, and he simply began walking away. CSPD officers ordered Mr. Moss to stop walking away. Mr. Moss complied and turned around to face the officers. The officers then threatened to use their TASER weapons on Mr. Moss. Mr. Moss asked, "For what?" The officers then proceeded to shoot Mr. Moss with a TASER weapon. Again, the City of Colorado

Springs took the position that the officers were acting within the scope of their employment and acting in good faith. On information and belief, the City of Colorado Springs has agreed to settle this case with Mr. Moss. *Id.* at 14.

Michael Sexton

On June 7, 2019, Michael Sexton flipped the middle finger to a CSPD officer as the officer drove by on the street and as Mr. Sexton stood on the sidewalk. The CSPD officer got out of his car, grabbed Mr. Sexton by the arm, and forced Mr. Sexton against his patrol car. The CSPD officer then claimed that his use of force against Mr. Sexton was due to Mr. Sexton jaywalking. The CSPD officer was not disciplined for his wrongful arrest, clear violation of the First Amendment, and unlawful use of force. On information and belief, the City of Colorado Springs settled the lawsuit filed by Mr. Sexton. *Id.* at 15.

Jeffrey Melvin

On April 26, 2018, CSPD officers responded to a noise violation at an apartment complex in Colorado Springs. After the officers had determined that no crime had been committed, there was no ongoing crime, and those present did not have outstanding warrants, they encountered Jeffrey Melvin, Jr., a young black man arriving at the apartment. The officers had no reason to believe that Mr. Melvin had been or was about to be engaged in any criminal activity. The two officers nevertheless attempted to arrest Mr. Melvin. While attempting to unlawfully arrest

Mr. Melvin—without probable cause to believe that he had committed any crime—these officers used overwhelming force against him. The officers aggressively manhandled Mr. Melvin threw him to the ground, and repeatedly tased him. Mr. Melvin briefly escaped the officers' wholly unconstitutional assault, only to collapse from the extreme trauma the officers had inflicted on him. He was rushed to the hospital, but Mr. Melvin never regained consciousness and died from his injuries days later, at the age of 27. This excessive force is the subject of the federal civil rights action captioned *Estate of Jeffrey Melvin, Jr. v. Colorado Springs*, et al., Case no. 20-cv-00991-CMA- KMT (D. Colo. 2020). *Id.* at 15-16.

Ryan and Joey Brown

On March 25, 2015, brothers Ryan and Joey Brown were pulled over by CSPD officers. The brothers were young black men who were driving to their home. CSPD officers had no grounds on which to pull them over, and officers would not tell the Brown brothers why they had been pulled over. Instead, the officers held them at taser- and gunpoint. Though the brothers had done nothing wrong, the officers ordered them out of their car at gunpoint, frisked them, threw Ryan to the ground and threw his phone away to stop him from recording the interaction. The officers wrongfully arrested both brothers, and CSPD responded to the brothers' complaint about their mistreatment by determining that the officers conduct was

within official policy and justified. Colorado Springs paid $212,000 and made substantial policy changes to settle the Brown brothers' claims. *Id.*at 16.

Grant Bloomquist

In 2013, CSPD officers arrested Grant Bloomquist without probable cause after he verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr. Bloomquist was outside Cowboys Night Club in Colorado Springs and saw officers brutally beating an African American man, so he stepped to about 7 feet away and said, get the fuck off him." At that point, he was blindsided and struck by an officer, who hit him in the face. Multiple CSPD officers struck Mr. Bloomquist repeatedly in the groin area with knee strikes and pinned him against a police vehicle. The officers then threw him in the police car and arrested him. Colorado Springs settled a lawsuit based on CSPD officers' conduct against Mr. Bloomquist in 2016. *Id.*at 16-17.

John Sturgis

On January 26, 2012, CSPD officers arrested John Sturgis without probable cause and subjected him to excessive force while investigating Mr. Sturgis as a homicide suspect. Mr. Sturgis was not the perpetrator of any crime. A witness had allegedly told CSPD officers he had seen a man at a gas station—Mr. Sturgis—who he claimed resembled a homicide suspect. Mr. Sturgis in fact was twice the age of the suspect (40 vs 20), was bald when the suspect had hair, and exhibited many other

physical dissimilarities with the suspect. Despite these obvious differences, officers followed Mr. Sturgis and arrested him. Mr. Sturgis surrendered peacefully and asked the officers not to handcuff him behind his back because he had recently had surgery on his shoulder; he even offered to show the officers MRI images of his injured shoulder that were sitting on the front seat of his car as proof. The officers ignored Mr. Sturgis's pleas, and excessively forcefully handcuffed him behind the back despite his pleas not to do so, causing Mr. Sturgis to significantly reinjure his shoulder and require further surgery. Several officers falsified their reports about the incident to invent probable cause to arrest Mr. Sturgis. Colorado Springs determined that the officers' conduct was within policy but paid $300,000 to settle Mr. Strugis' claims. *Id.* at 17.

Douglas Sellier

On June 2, 2009, CSPD officers came to Douglas Sellier's home to retrieve Mr. Sellier's grandson. When Mr. Sellier insisted that the man to whom the officers were bringing the child was a sex offender, the officers told Mr. Sellier he was under arrest. Officers grabbed Mr. Sellier. He lost consciousness and came to while pinned on the ground by CSPD officers. While Mr. Sellier was pinned to the ground, a CSPD officer punched him three times in the shoulder and another officer deployed his taser on Mr. Sellier twice. Mr. Sellier filed suit, arguing that CSPD officers had used excessive force against him. After a federal judge denied the Defendants'

motion for summary judgment, Colorado Springs settled Mr. Sellier's clams for $50,000. Colorado Springs argued that the police officers conduct was within police department policy and appropriate. Colorado Springs never disciplined or counseled the CSPD officers involved. *Id.* at 17-18.

Several of these representative cases resulted in Colorado Springs paying substantial monetary sums to settle police misconduct and excessive force claims. Yet, the facts surrounding Mr. Root's case makes clear that the Colorado Springs Police Department has yet to adequately train and supervise its officers regarding the appropriate and legal use of force or otherwise ensure that the ongoing custom and practice of police using excessive force, as occurred here, ends. *Id.* at 18. Appellee Colorado Springs knew, based on its long history and widespread practice of its officers using excessive force and its condoning of those actions, that its officers would likely use excessive and unnecessary force against persons like Mr. Root. *Id.* Knowing this, Appellee Colorado Springs could have, and should have, pursued reasonable methods for training and supervising CSPD officers, including the individual Defendant, in not using excessive force, but it failed to do so. Appellee Colorado Springs has a policy that trains and tolerates its officers who use excessive and deadly force, even under circumstances where the officer or a third party is not at the time in imminent risk of death or serious bodily injury. *Id.* at 19. Additionally, on information and belief, Appellee Comstock, in 2021, previously shot and killed

another individual while on duty, Ahmad Akeem Abdul Muhammad. CSPD determined that Appellee Comstock had acted within CSPD policy and training in killing Mr. Muhammad. *Id.* Because Appellee Colorado Springs created and tolerated a custom of deliberate indifference and failed to adequately train and supervise CSPD officers in the constitutional use of force, individuals, like Mr. Root, have repeatedly been subjected to violations of their constitutional rights. *Id.* Appellee Colorado Springs fostered a policy of inaction in the face of knowledge that CSPD officers were frequently violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which is the functional equivalent of a decision by Colorado Springs itself to violate the Constitution. *Id.* Defendant Colorado Springs's "policy of inaction" and policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of Appellee Comstock's violation of Mr. Root's constitutional rights. CSPD has persistently failed to counsel or discipline CSPD officers for their similar uses of excessive force. *Id.* Colorado Springs's failure to find wrongdoing and failure to counsel or discipline Appellee Comstock in this case, the cases described above, and others reflects a custom, policy, or practice of encouraging, tolerating, and ratifying blatantly illegal conduct. *Id.* at 20. These encouragements, toleration of, and ratifications show that CSPD officers carry out such police misconduct under the policies of and regimen of training provided by

Colorado Springs, and that such conduct is customary within CSPD. *Id.* The failure to find wrongdoing, failure to counsel, and failure to discipline serves as a ratification by Defendant Colorado Springs, CSPD, and the CSPD Chief of Police, as a decision-maker and policy-maker for the CSPD, of the illegal conduct of CSPD officers. *Id.* Despite being on notice from prior lawsuits, press, and settlements that continued tolerance of violations of constitutional rights was substantially certain to result in a constitutional injury like that suffered by Mr. Root here; Colorado Springs has consciously chosen not to remedy its deficient customs and chosen to instead ignore the risk of harm caused by the customs. *Id.* CSPD's approval and defense of the use of excessive force by CSPD employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually trains CSPD law enforcement officers—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future. *Id.* Colorado Springs is responsible for training its officers to ensure they perform their duties consistent with the law and to discipline their improper conduct, so officers can learn from their experiences and be deterred from engaging in future misconduct that violates the constitutional rights of people with whom the police interact. *Id.* at 21. Colorado Springs's failure to do so has communicated to, and trained, CSPD officers, including Appellee Comstock , that excessive force is authorized and tacitly (or

explicitly) encouraged. The failure to counsel or discipline misconduct constitutes training which causes future similar unconstitutional conduct. *Id.* Appellee Colorado Springs' past ratification and toleration of similar unconstitutional conduct thus caused and was the moving force behind the Appellee Comstock's use of excessive force against Mr. Root, and Colorado Springs' failure to discipline the Individual Defendant for this illegal use of force will lead to more unconstitutional conduct. *Id.* Appellee Colorado Springs' acts or omissions caused Mr. Root damages, because he suffered quadriplegia, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses. *Id.* Appellee Colorado Springs' actions, as described, deprived Mr. Root of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages. *Id.*

## SUMMARY OF THE ARGUMENT

The district court made a reversible error by impermissibly applying what amounted to a heightened pleading requirement by insisting that Mr. Root had to allege "specific facts" beyond those necessary to state his claim and the grounds showing entitlement to relief. The district court also construed the facts in a manner that favored the moving party, the Appellees, during the motion to dismiss phase. This approach contradicts the established standard of review for motions to dismiss

as outlined in *Twombly*. Rather than simply overlooking the allegations presented in the Appellant's Amended Complaint, the district court placed significant weight on the assertions made in the Defendants' Motion to Dismiss, treating them as factual that resulted in a dismissal of the Appellant's federal claims. This approach also contradicts the established standard of review for motions to dismiss as outlined in *Twombly*. Furthermore, the district court incorrectly determined that the Appellant did not adequately state a *Monell* claim against the City of Colorado Springs.

Additionally, the district court erred by neglecting to recognize that using a taser on an unarmed, non-threatening individual in a vulnerable position constituted excessive force, thereby violating the Appellant's Fourth Amendment rights. Lastly, the district court incorrectly imposed a requirement on the Appellant to search for prior cases with identical facts, rather than focusing on whether the law provided officials with fair notice that the conduct in question was unconstitutional. Consequently, the Appellees' Motion to Dismiss should not have been granted, and Appellee Comstock is not entitled to qualified immunity at this stage of the proceedings.

## STANDARD OF REVIEW

The Court review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss *See Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 700 (10th Cir. 2014). At the motion to dismiss stage, a court should consider all well-pleaded allegations to

be true and view them in the light most favorable to the non-moving party, *See, e.g., Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). To survive a Rule 12(b)(6) motion, the complaint must contain factual allegations that plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting. *Twombly* at 555.).

## ARGUMENT

I.  The district court committed reversible legal error by impermissibly applying what amounted to a heightened pleading and construing facts in the light most favorable to the moving party at the motion to dismiss stage.

The district court impermissibly applied what amounted to a heightened pleading requirement by insisting that Mr. Root had to allege "specific facts" beyond those necessary to state his claim and the grounds showing entitlement to relief. *See Id.*, at 570. In reviewing a motion to dismiss, "all well-pleaded factual allegations in the ... complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir.2006) (quotation omitted). Because the Court is reviewing the qualified immunity issue in the context of a motion to dismiss, the Court must bear in mind the standard governing motions to dismiss, which the Supreme Court addressed in *Twombly* and *Iqbal. See Brown v. Montoya*, 662 F.3d 1152, 1162-63

(10th Cir. 2011). In *Twombly*, the Court held that, to survive a motion to dismiss, plaintiffs' pleadings must "nudge[ ] their claims across the line from conceivable to plausible." 550 U.S. at 570. In *Iqbal*, the Court applied *Twombly* to a motion to dismiss based on qualified immunity in a *Bivens* action. *Iqbal* formulated the test in this way:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Iqbal* at 678.

The district court created its own narrative suggesting that Mr. Root was moving toward a busy roadway, which allegedly put both motorists and the officers in pursuit at significant risk. As previously mentioned, the district court not only overlooked the allegations presented in the Appellant's Amended Complaint but also placed significant weight on assertions made in the Appellees' Motion to Dismiss, treating them as factual in its decision to dismiss the Appellant's federal claims. In particular, the district court fabricated the account that Mr. Root was heading towards a heavily trafficked road, thereby posing an immediate danger to both drivers and the pursuing officers. In the absence of video evidence or allegations in the Appellant's Amended Complaint, the district court concluded that Mr. Root was approaching a busy

roadway, which created an immediate threat to both motorists and the officers in pursuit. The following findings in the district court's order, is evident that the district court created its own narrative suggesting that Mr. Root was moving toward a busy roadway, which allegedly put both motorists and the officers in pursuit at significant risk:

> When officers later confronted Mr. Root after he emerged from the gas station, he resisted arrest and proceeded to ***run towards a busy roadway, which created an immediate safety risk to motorists and the officers in pursuit***. Vol. I, at 64.

> When Mr. Root refused to stop and proceeded to ***run towards a busy roadway***, Officer Comstock made a split-second decision to fire his taser at him. *Id.*

> Those circumstances included a suspected felon who had struck a police vehicle while fleeing from officers, who had not responded to multiple lesser uses of force, and ***who was creating an apparent danger to himself and the public by running towards a busy street***. *Id.* at 65.

Based on the above facts, the district court not only embraced and supported the story outlined in the Appellees' motion to dismiss, but it also deviated from the established standard of review by rewriting the Appellant's Amended Complaint and imposing its own interpretation of the events. During the motion to dismiss phase, the district court is required to treat all well-pleaded allegations as true and to interpret them in the most favorable light for the non-moving party. *See Truman* at. 1235. This standard was not adhered to by the district court. A brief examination of the Appellant's Amended Complaint reveals that the Amended Complaint alleged

that: ***Mr. Root left the gas station with a ½ gallon of milk in his hand. Upon noticing the officers, Mr. Root began to run past the gas pumps and toward the sidewalk on Airport Road***. Vol. I, at 10. The Appellant's Amended Complaint does not reference a heavily trafficked road or busy roadway. Furthermore, as previously mentioned, the district court did not have access to or rely on any video evidence that would blatantly contradict the allegations made in the Appellant's Amended Complaint. Such evidence could have permitted the district court to look beyond the confines of the Appellant's Amended Complaint, but instead, it only served to contradict the allegations presented. *See Scott v. Harris*, 550 U.S. 372 (2007). The district court, in its actions, overlooked the appropriate standard of review and took it upon itself to engage in the case as it deemed fit. Although a case may be captivating, this is not the function of the court. At the trial level, district courts have the responsibility to guarantee that trials are conducted fairly. This includes leaving factual disagreements for a jury to decide, as mandated by the Seventh Amendment.

II. The district court made an error in concluding that the Appellant failed to sufficiently present a claim against the City of Colorado Springs, specifically regarding a custom that directly connects that custom to the injury claimed by Mr. Root.

The Appellant's Amended Complaint effectively articulates factual allegations that establish a claim against the City of Colorado Springs, particularly concerning a custom that is directly linked to the injury asserted by Mr. Root. As

stated above, in reviewing a motion to dismiss, "all well-pleaded factual allegations in the ... complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir.2006) (quotation omitted).

A plaintiff suing a municipality under 42 U.S.C. § 1983 for the actions of one of its officers must prove (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Okla. Cnty. Bd. of Cnty. Com'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). It has been well established that a municipality cannot be liable under *Monell*, "solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under a respondeat superior theory." Rather, to be held liable the municipality itself must have generated the "moving force" behind the alleged constitutional violation, either through official policy or widespread and pervasive custom. *See City of Canton v. Harris*, 489 U.S. 378, 388-89, (1989). Here, the Appellant's Amended Complaint outlines eight distinct instances in which police officers from the City of Colorado Springs allegedly employed excessive or unlawful force against civilians. Importantly, in every case, the affected individuals sustained serious injuries, and the City of Colorado Springs awarded monetary settlements to each of them, despite concluding that the officers' actions were in line

with departmental policies and deemed appropriate.[2] Furthermore, the City of Colorado Springs did not take any disciplinary action or provide counseling to the involved CSPD officers. The Appellant's Amended Complaint paints a troubling picture of a pattern within the City of Colorado Springs that tends to excuse officer misconduct, which directly contributed to the unlawful and excessive force resulting in the injuries claimed by Mr. Root. The district court has once more failed to adhere to the correct standard of review, choosing instead to intervene in the case according to its own judgment. The Appellant's Amended Complaint successfully satisfies the requirements of F.R.C.P Rule 8 by presenting facts that Appellee Comstock committed a constitutional violation, and Appellee City of Colorado Springs' customs were the moving force behind Mr. Root's constitutional deprivation.

III. The district court erred by neglecting to recognize that using a taser on an unarmed, non-threatening individual in an elevated/vulnerable position constituted excessive force, thereby violating the Appellant's Fourth Amendment rights.

A. Appellant Comstock is Not Entitled to Qualified Immunity at the Motion to Dismiss Stage.

Government defendants sued under § 1983 in their individual capacities may raise the defense of qualified immunity: government officials are not subject to

---

[2] 20-cv-00991-CMA- KMT (D. Colo. 2020): A trial has been scheduled to assess whether the City of Colorado Springs is responsible to the plaintiff under 42 U.S.C. § 1983 for not providing sufficient training to its police officers regarding the use of force and Taser deployment.

damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Estate of Melvin v. City of Colo. Springs*, No. 23-1070, at *12 (10th Cir. Dec. 11, 2023). Thus, "[o]nce an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* Under the second prong, ordinarily, "[i]t is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016).

However, because excessive force jurisprudence requires an all-things-considered inquiry with 'careful attention to the facts and circumstances of each particular case,' there will almost never be a previously published opinion involving exactly the same circumstances. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396(1989).; *see also Estate of Melvin*, No. 23-1070, at *13. Thus, the Court's analysis is not "a scavenger hunt for prior cases with precisely the same facts" and is instead an "inquiry of whether the law put officials on fair notice that the described conduct

was unconstitutional." *Id*.; *see also Truman* at. 1235; *Estate of Melvin*, No. 23-1070, at *13.

Notably, "binding" precedent holding the specific conduct unconstitutional is not the standard for qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That clarity can come from either "controlling authority or a robust consensus of cases of persuasive authority," *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citing *Wilson v. Layne*, 526 U. S. 603, 617 (1999) (internal quotations omitted). In an obvious case," even general standards "without a body of relevant case law" suffice. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Simply put, "it is not necessary to find a 'case directly on point' in order to show that the law governing a plaintiff's claim is clearly established. Some measure of abstraction and common sense is required with respect to police methods and weapons...." *Terebesi v. Torreso*, 764 F.3d 217, 237 n.20 (2d Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Indeed, a contrary conclusion would give officers "a free pass to use" weapons "in any manner" they see fit "until a case from the Supreme Court or from this circuit involving that particular weapon is decided." *Phillips v. Comm. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012). Qualified immunity demands no such thing. A prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law. All the same, the Supreme Court has cautioned circuit courts 'not to define clearly established law at

a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established. *Perea*, 817 F.3d at 1204 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).; *see also Estate of Melvin*, No. 23-1070, at *13. In *Casey* the Court held, "We cannot find qualified immunity wherever we have a new fact pattern." 509 F.3d at 1284. Further, the Supreme Court has "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006). A general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though [such conduct] has not previously been held unlawful. *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006). The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

B. Reasonableness test in excessive force cases

"All claims that law enforcement officials have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are properly analyzed under the Fourth Amendment's "objective reasonableness" standard." *Graham v. Connor*, 490 U.S. 386 (1989). "This inquiry

turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)). "The precise question asked in an excessive force case is "whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Reasonableness is evaluated under a totality of the circumstances approach, which requires that we consider and balance the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*., at 396. The Tenth Circuit assess objective reasonableness based on "whether the totality of the circumstances justified the use of force and pay careful attention to the facts and circumstances of the particular case." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (describing the reasonableness test as requiring a court to "slosh our way through the fact-bound morass of reasonableness" by "conducting [a] balancing act" (internal quotation marks omitted)). Further, the Tenth Circuit recognizes that officers may have "to make split-second judgments in uncertain and dangerous circumstances." *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) (internal quotation marks omitted); see

also *Cordova*, 569 F.3d at 1188. If a particular use of force is considered deadly force, then an officer's use of that force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Larsen* at 1260 (internal quotation marks omitted); *see Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Deadly force is such force that "create[s] a substantial risk of causing death or serious bodily harm." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 n. 2 (10th Cir. 2004) (internal quotation marks omitted); *see Ryder v. City of Topeka*, 814 F.2d 1412, 1417 n. 11 (10th Cir. 1987). In assessing the degree of threat the suspect poses to the officers, we consider factors that include, but are not limited to: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260.

C. Tasing a person in an elevated position or a location where a fall may cause substantial injury or death was forbidden and constitutionally unreasonable.

It has been clearly established, if a particular use of force is considered deadly force, then an officer's use of that force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Larsen*, 511 F.3d at 1260 (internal quotation marks omitted); *see Tennessee v. Garner*, at 11. "It is widely

known among law enforcement that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall." *Baker v. Union Twp.*, 587 F. App'x 229 (6th Cir. 2014) ("It is widely known among law enforcement and was even a subject of [Defendant's] police training that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall."). In fact, on the date in question, the Colorado Springs Police Department Standard Operating Procedures forbids tasing an individual in an elevated position or in a location where a fall may cause substantial injury or death. See Vol. I, at 52. "The fact that the use of a taser – which is ordinarily a non-lethal weapon – may, under certain circumstances, create a risk of serious injury or death that could make the use of the taser under those circumstances constitutionally unreasonable." *Peroza-Benitez v. Smith*, 994 F.3d 157, 168 (3d Cir. 2021) (quoting *Martin v. City of Reading*, 118 F. Supp. 3d 751, 762 n.8 (E.D. Pa. 2015)). The Court should recognize that it is widely acknowledged in law enforcement that using a TASER on an individual at an elevated position carries a considerable risk of severe injury due to a possible fall. Furthermore, this guideline is clearly outlined in Appellee Comstock's departmental policy and training, which expressly forbids the use of a TASER in these circumstances.

In *Martin v. City of Reading*, police pursued the plaintiff to a highway overpass, from which the plaintiff fell nearly 40 feet onto concrete after being tased

by a City of Reading police officer. 118 F. Supp. 3d 751, 756-58 (E.D. Pa. 2015). The plaintiff brought a § 1983 action against the police officer for use of excessive force in violation of his Fourth Amendment rights, alleging that the police officer's deployment of the Taser caused him to fall from the overpass. *Id*. At summary judgment, rather than focusing "on the qualitative characteristics of the particular type of weapon [the police officer] chose to employ," the district court instead considered "whether a reasonable officer would understand that attempting to effect Plaintiff's arrest by using force that carried with it a risk of serious injury or death violated Plaintiff's rights." *Id*., at 765-66. Answering in the affirmative, the district court – viewing the facts in the light most favorable to the plaintiff as the non-moving party – denied the police officer summary judgment on the grounds of qualified immunity. In support of its finding, the court in Martin cited a number of similar excessive force cases where courts have denied (or affirmed the denial of) a defendant's motion for summary judgment on the grounds of qualified immunity based on the following fact pattern: Police tased an individual who is positioned on an elevated surface at a height that carries with it a risk of serious injury or death, causing the individual to fall. *Id*., at 766-67; accord *Baker,* 587 at. 234 ("It is widely known among law enforcement and was even a subject of [the officer's] police training that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall."); *Negron v. City of New*

*York*, 976 F. Supp. 2d 360, 368, 371 (E.D.N.Y. 2013) (noting that "[the officers] should have known" that tasing the plaintiff – who was "standing on a small, unenclosed ledge ten feet off the ground" – "was unreasonable even despite the lack of precedent involving tasers used under similar circumstances"); *Rockwell v. Rawlins*, No. 13-cv-3049, 2014 WL 5426716, at *4 (D. Md. Oct. 23, 2014) ("While tasers may not constitute deadly force in some scenarios, deadly force was clearly used in this case. [The plaintiff] was standing on a narrow second-story ledge/roof, and there is no evidence to suggest that a reasonable police officer would not have expected [the plaintiff] to fall if he was tased.") (footnote omitted); *Peabody v. Perry Twp.*, No. 10-cv-1078, 2013 WL 1327026, at *5-7 (S.D. Oh. Mar. 29, 2013) (noting that a reasonable jury could determine that the deployment of a taser against an individual climbing an eight-foot fence could constitute deadly or lethal force); *Snauer v. City of Springfield*, No. 09-cv-6277, 2010 WL 4875784, at *5 (D. Or. Oct. 1, 2010), report and recommendation adopted by district judge 2010 WL 4861135 (D. Or. Nov. 23, 2010) ("[The officer] was trained in the use of a taser and knew well that a tasered suspect becomes temporarily paralyzed. ... It does not take a panel of judges to alert a reasonable police officer that causing a [temporarily] paralyzed man to tumble headfirst onto the ground from a platform six to seven feet above the ground creates a substantial risk of causing death or serious bodily injury.") (citation and internal quotations omitted); *Harper v. Perkins*, 459 F. App'x 822, 827-28 (11th

Cir. 2012) (affirming district court's denial of defendant's motion to dismiss on the grounds of qualified immunity because inter alia the defendant's force "was obviously and clearly excessive," particularly given that "a taser was used on a person standing with his hands in the air at least four feet off the ground in a tree"); *Cook v. Riley*, No. 11-cv-24, 2012 WL 2239743, at *12 (M.D.N.C. June 15, 2012) (recommending denial of summary judgment on the grounds of qualified immunity in part because "[the plaintiff] was perched on a small platform 15 feet in the air at the time of the TASER deployment [and a] fact finder could conclude that a reasonable officer would foresee that utilizing a TASER under such circumstances could cause the targeted individual to fall and thereby to suffer serious harm ....") (internal citations omitted).

In *Bradley v. Benton*, 10 F.4th 1232, 1237 (11th Cir. 2021), Officer Benton testified that he was aware of and understood police department policy that a taser "will cause most everyone to fall and therefore should not be used when the risk of falling would likely result in death[.]" *Id.* He also agreed that under that policy it was "not appropriate" to use a taser "if someone is at an elevated height[.]" *Id.* Tracy Rucker, the master instructor on taser use for DeKalb County, testified that a person who is tased will experience "neuromuscular incapacitation" and will be paralyzed from pain for around five seconds. *Id.* He also testified that he instructed DeKalb County officers that tasers could be deadly when the target is in a dangerous position

such as an elevated height. *Id.* (emphasis added) ***And he affirmed that even a fall "from a level that's not that high" can cause serious injury when the victim has been incapacitated by a taser***. *Id.* (emphasis added)    Moreover, again taking the facts in the light most favorable to the plaintiffs, Officer Benton knew that he was using deadly force when he tased Robinson on top of the wall. He had been trained that a person who is tased will experience "neuromuscular incapacitation" and will be paralyzed from pain for around five seconds; more than enough time for Robinson to lose his balance and fall from atop the wall. In his deposition, Officer Benton was asked if he understood department policy that a taser "should not be used when the risk of falling would likely result in death, for example, on a roof or next to a swimming pool." He replied that he did. He was then asked if he agreed that it was "not appropriate" to use a taser "if someone is at an elevated height[.]" He replied, "I agree."  When deciding whether to grant summary judgment on an excessive force claim, relevant facts include departmental instructions and other well-known police guidance). *Bradley*, at 1241.  A use of force is considered deadly when it poses "a substantial risk of causing death or serious bodily harm." *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (quoting Model Penal Code § 3.11(2) (Am. L. Inst., Proposed Official Draft 1962)). Even a normally non-lethal weapon "qualifies as 'deadly force' " under certain circumstances, "especially if an officer hits a suspect in the head." *Gambrel v. Knox County*, 25 F.4th 391, 401 (6th Cir. 2022) (quoting

Robinette, 854 F.2d at 912) (collecting cases). As sated above, use of a TASER weapon in risky situations may cause significant harm. See, e.g., *Baker,* 587 at. 234 ("It is widely known among law enforcement . . . that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall.").

The key question in this case is whether Officer Comstock's decision to use a taser on Mr. Root while he was in an elevated position, where a fall could lead to serious injury or even death, was prohibited and unconstitutional according to the Amended Complaint. The crucial issue at hand is whether Officer Comstock's decision to use a taser on Mr. Root, who was in a precarious position that could be considered life-threatening, was justified given the situation "[T]he term [deadly force] encompasses a range of applications of force, some more certain to cause death than others. It includes force that is 'likely' to cause serious injury or death...." *Cordova,* at. 1189. "The reasonableness of [the officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (quotation omitted). As stated above, "it is widely known among law enforcement that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting

fall." *Baker v. Union Twp.*, 587 F. App'x 229, 10 (6th Cir. 2014). (Police tase an individual who is positioned on an elevated surface at a height that carries with it a risk of serious injury or death, causing the individual to fall. *Id.* at 234.)). By acknowledging the Plaintiff's claims in the Amended Complaint as valid, these allegations significantly exceed the pleading standard set by FRCP 8 and present a facially plausible basis for relief. Ultimately, if this Court acknowledges the Plaintiff's Amended Complaint as presented and considers all reasonable inferences regarding Appellee Comstock's liability for the alleged misconduct, it should at the very least conclude that Appellee Comstock's decision to use a Taser on Mr. Root while he was in an elevated position—where a fall could lead to serious injury or death—was both prohibited and constitutionally unreasonable, as outlined in the Amended Complaint. The district court, however, rejected the claim that Appellee Comstock violated the policy of the Colorado Springs Police Department by using a taser on Mr. Root while he was in an elevated position or in a place where a fall could result in serious injury or death. See Vol. I, at 65.

In his order the district court wrote the following in a footnote:

> Mr. Root claims Officer Comstock's use of a taser amounted to deadly force in violation of the Fourth Amendment and Colorado Springs Police Department's procedures. See Dkt. 22 at 7–16. But Mr. Root provides no details describing the elevated position he was allegedly in—nothing regarding the height he was at vis-à-vis the ground (or that he was even off the ground), or the degree of decline he was running down—and the cases he cites in support of this claim are remarkably dissimilar to the facts he alleges, viz., he was not on a wall, ledge,

ladder, roof, or fence off the ground. See id. at 9–10. The danger here was not such that using a taser was likely to cause death. *Id.*

The district court, as indicated in the footnote above, clearly deviated from the appropriate standard of review during the motion to dismiss phase. It mistakenly imposed a heightened pleading requirement on the Amended Complaint, which contradicts established legal principles. This decision strayed significantly from the clear guideline set forth in *Twombly*, which states that for a claim to survive a motion to dismiss, plaintiffs must "nudge their claims across the line from conceivable to plausible". *Twombly* at 570. Furthermore, in *Iqbal*, the Court extended the T*wombly* standard to motions to dismiss involving qualified immunity in *Bivens* cases. Here, the district court based its conclusion on incorrect assumptions regarding the height and steepness of the slope as a relevant factor as to whether the force used by Appellee Comstock was not likely to cause death. Notably, Tracy Rucker, the master instructor on taser use for DeKalb County testified in *Benton*, ***that he instructed DeKalb County officers that tasers could be deadly when the target is in a dangerous position such as an elevated height that even a fall "from a level that's not that high" can cause serious injury when the victim has been incapacitated by a taser***. *See Bradley at.* 1237. (emphasis added). The key question here is not whether the force was likely to result in death. Rather, the inquiry—though somewhat premature at the motion to dismiss stage—focuses on whether the force posed a significant risk of causing death or serious bodily injury, which would render

it excessive given the circumstances. The district court hastily dismissed Mr. Root's case, denying him the chance to present vital evidence and facts at summary judgement stage or trial that would illustrate how Appellee Comstock's use of force was both unwarranted and excessive, leading to Mr. Root being paralyzed from the shoulders down, which may last for the rest of his life. The district court judge made an unreasonable assumption by distorting the facts and abandoning the appropriate standard of review during the motion to dismiss. Ultimately, considering the profound and enduring effects of Mr. Root's injuries, the district court ought to have permitted the Appellant to amend his complaint if it deemed it lacking. *See Iqbal* at 687. At this point in the litigation, Appellee Comstock is not entitled to qualified immunity – if at all. Given the legal precedents discussed and the serious nature of his actions, coupled with the lack of any reasonable justification for the use of excessive force, he does not meet the criteria for qualified immunity in either the *Estate of Larsen ex rel. Sturdivan* or *Cordova* cases at this stage.

## CONCLUSION

Given the reasons outlined above, the order from the district court that granted Appellee Comstock qualified immunity and approved the City of Colorado Springs' motion to dismiss the Appellant's Amended Complaint should be overturned and remanded to the district court for further consideration.

Respectfully submitted 23rd April 2025.

Law Offices of Harry M. Daniels, LLC    JOLLY LAW, P.L.L.C

/s/Harry M. Daniels, Jr.
Harry M. Daniels, Jr.
Georgia Bar 234158
4751 Best Rd. Suite 490
Atlanta, Georgia 30337
Telephone: (678) 664-8529 Facsimile:
(800) 867-5248
daniels@harrymdaniels.com

/s/Tyler A. Jolly
Tyler A. Jolly, #52361
9996 W U.S. Highway 50, Unit
1090 Salida, CO 81201
Phone: 719-429-7359
Tyler@jollylawcolorado.com

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Appellants respectfully request oral argument because this case involves the important issue of the application of the qualified immunity standard, and Appellants believe oral argument will assist this Court in its review of the issues raised herein.

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 32(a)(7)(c) because:

   ☒ this document contains 10930 words, and

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word, Version 2411, in Times New Roman size 14.

   /s/Harry M. Daniels, Jr.
   Harry M. Daniels, Jr.
   Georgia Bar 234158

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Appellants' Opening Brief:

All required privacy redactions have been made per 10th Cir. R. 25.5; if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, {Avast Security, 1Version 1.15 (Revised July 11, 2023)}, and according to the program are free of viruses.

   /s/Harry M. Daniels, Jr.
   Harry M. Daniels, Jr.
   Georgia Bar 234158

## NOTICE OF ATTACHMENT

There is a PDF attachment to this brief.

/s/Harry M. Daniels, Jr.
Harry M. Daniels, Jr.
Georgia Bar 234158

## CERTIFICATE OF SERVICE

I hereby certify that on April 23rd, 2025, I electronically filed the foregoing Appellants' Opening Brief using the court's CM/ECF system which will send notification of such filing to all registered counsel of record.

/s/Harry M. Daniels, Jr.
Harry M. Daniels, Jr.
Georgia Bar 234158

## COPY OF DECISION UNDER REVIEW

A copy of the district court's decision granting qualified immunity and granting City of Colorado Springs' Motion to Dismiss, App. Vol. I, at 58 (Dkt. 29), is attached hereto and follows immediately after this page.

/s/Harry M. Daniels, Jr.
Harry M. Daniels, Jr.
Georgia Bar 234158

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:24-cv-01293-DDD-TPO

JACOB ROOT,

      Plaintiff,

v.

OFFICER ROBERT COMSTOCK, in his individual capacity;
CITY OF COLORADO SPRINGS, a municipality,

      Defendants.

---

## ORDER GRANTING MOTION TO DISMISS

---

While running away from police, Plaintiff Jacob Root was tased by Colorado Springs Police Officer Robert Comstock and fell to the ground. In the fall, Mr. Root broke his neck and is now quadriplegic. He brings state and federal claims of excessive force against Officer Comstock and against the City of Colorado Springs for failure to adequately train its officers. *See* Dkt. 6 at 16–25. The Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 12. For the reasons below, the motion is granted.

## LEGAL STANDARD

A court's role in addressing a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the

plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation marks omitted)." But "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (quoting in part Fed. R. Civ. P. 8(a)(2)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). So, a court can "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## BACKGROUND

Mr. Root alleges that on May 16, 2022, "thirteen law enforcement officers across three agencies [] were working together as part of the "BATTLE" (Beat Auto Theft Through Law Enforcement) task force," which included Officer Comstock. Dkt. 6 at 3. About ten days prior, the task force officers had received a report that an unlocked 2017 Ford Fusion was stolen from a parking lot near the complaining witness's home sometime during the night. *Id.* at 4. On May 16, members of the task force spotted that car unoccupied in the parking lot of a Super 8 Motel in Colorado Springs. *Id.* Rather than recover the car, "the task force members affixed a tracking device to [it]" and later tracked it to another hotel. *Id.* When officers arrived there, they waited for the driver to return to the car and, when he did, "attempted to block [him] from leaving the parking lot." *Id.* The driver was able to evade the police cruisers, however, "colliding and causing damage to [one] in the process." *Id.* At

that point, the task force officers did not pursue the car, but "later tracked [it] to a Kum & Go gas station on Airport Road in Colorado Springs" with Mr. Root inside. *Id.* at 5.

The Amended Complaint then alleges that officers observed Mr. Root "get out of his car and enter the gas station." *Id.* "While Mr. Root was in the gas station, the task force members surrounded the building and parking lot." *Id.* They then observed Mr. Root "exit[] the gas station" and "[u]pon seeing the officers, [] run past the gas pumps and towards the sidewalk on Airport Road." *Id.* As Mr. Root was running, one officer "shot at [him] with a 'Bola Wrap,'" which missed.[1] *Id.* Officer Comstock was also chasing Mr. Root on foot by this point and, while Mr. Root was "running down the elevated slope dividing the gas station from the sidewalk on Airport Road," "without warning Mr. Root he would use his TASER weapon," Officer Comstock tased him in the back. *Id.* Mr. Root, who "experienced muscular incapacitation upon being shot" and "could not use his hands or arms to break his fall, fell head-first down the decline, across the sidewalk, and off the curb down into the street." *Id.* at 5–6. Because Mr. Root "broke his neck during the fall," he "remained face down in the street, face bloodied and groaning in agony, as officers surrounded him and placed him in handcuffs." *Id.* at 6. At the time he was tased by Officer Comstock, Mr. Root alleges that he did not have a weapon on him, did not make verbal threats that he was armed or intended to use force against anyone, did not use force against anyone, and was running away from police. *Id.*

The Amended Complaint also contains a number of allegations regarding the City of Colorado Springs's "custom and practice of using and

---

[1] A Bola Wrap is a hand-held remote restraint device that deploys a Kevlar cord to wrap around an individual's legs or arms to prevent them from moving.

ratifying excessive force":

29. It has long been the custom and actual practice of CSPD to engage in, encourage, and condone the use of excessive force by CSPD officers.

30. Colorado Springs did not terminate or discipline Defendant Comstock for his actions against Mr. Root. Further, CSPD did not recommend any further training or counseling for Defendant Comstock, despite his actions against Mr. Root.

31. Colorado Springs' and the CSPD's official position regarding the shooting of Mr. Root in the back, causing him to fall and break his neck, was and is that Defendant Comstock's actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices and training of the City of Colorado Springs and the CSPD.

32. This ratification of the conduct that caused Mr. Root's quadriplegia is not alleged as proof that this ratification itself "caused" Mr. Root's injuries. Rather, it is evidence that the conduct was engaged in pursuant to policy, custom, and practice of the CSPD.

33. Defendant Comstock acted intentionally, knowingly, willfully, wantonly, maliciously and/ or recklessly in disregard to Mr. Root's federal protected rights, and acted under the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Colorado Springs acting under color of state law.

...

45. Defendant Colorado Springs knew, based on its long history and widespread practice of its officers using excessive force and its condoning of those actions, that its officers would likely use excessive and unnecessary force against persons like Mr. Root.

...

47. Defendant Colorado Springs has a policy that trains and tolerates its officers who use excessive and deadly force, even under circumstances where the officer or a third party is not at the time in imminent risk of death or serious bodily injury.

...

49. Because Defendant Colorado Springs created and tolerated a custom of deliberate indifference and failed to adequately train and supervise CSPD officers in the constitutional use of force, individuals, like Mr. Root, have repeatedly been subjected to violations of their constitutional rights.

50. Defendant Colorado Springs fostered a policy of inaction in the face of knowledge that CSPD officers were frequently violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which is the functional equivalent of a decision by Colorado Springs itself to violate the Constitution.

...

54. CSPD's approval and defense of the use of excessive force by CSPD employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually *trains* CSPD law enforcement officers—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future.

...

57. Defendant Colorado Springs' acts or omissions caused Mr. Root damages, because he suffered quadriplegia, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

*Id.* at 7–16.

As support for the above allegations against the City, the Amended Complaint also lists alleged prior victims of the City's excessive force policies: De'Von Bailey (*Id.* at 8), Dalvin Gadson (*Id.* at 8–9), Tyrone Moss (*Id.* at 9), Michael Sexton (*Id.* at 10), Jeffrey Melvin (Id. at 10–11), Ryan and Joey Brown (*Id.* at 11), Grant Bloomquist (*Id.* at 11–12), John Sturgis (*Id.* at 12), and Douglas Sellier (*Id.* at 12–13).

## DISCUSSION

Mr. Root's first claim for relief contends the actions of Officer Comstock amount to excessive force in violation of the Fourth Amendment. *Id.* at 16–17. His second claim is based on the same conduct and alleges a violation of Colorado Constitution Article II, Section 7. *Id.* at 20–22. His third claim contends the City of Colorado Springs's "policies, customs, and practices" violated Mr. Root's rights by failing to train or supervise police officers to prevent them from using excessive force against fleeing persons. *Id.* at 22–25.

## I.    Fourth Amendment

A Fourth Amendment excessive-force claim is governed by an objective standard: "A police officer violates an arrestee's ... Fourth Amendment right to be free from excessive force during an arrest if the officer's actions were not 'objectively reasonable' in light of the facts and circumstances confronting him." *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1213 (10th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (further quotation omitted). To determine the objective reasonableness of the use of force, a court "must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). In conducting this balancing, three factors should be considered: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396) (alteration omitted). "Ultimately the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017)

(internal quotations omitted).

Even accepting Mr. Root's allegations in the Amended Complaint as true and construing them in their most favorable light, the totality of the circumstances alleged justified Officer Comstock's use of force. According to the Amended Complaint, by the time Officer Comstock was pursuing Mr. Root at the gas station on Airport Road, he had reason to suspect Mr. Root already committed two dangerous felonies—the first by stealing a car, and a second by using that car to evade pursuing police officers (and striking a police cruiser along the way). *See* Dkt. 6 at 4. This would have put all officers involved on notice that the suspect presented a credible threat to their safety and that of the public. *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent.").

When officers later confronted Mr. Root after he emerged from the gas station, he resisted arrest and proceeded to run towards a busy roadway, which created an immediate safety risk to motorists and the officers in pursuit. Dkt. 6 at 5. This too adds to the reasonableness of the use of a taser. *See Ill. v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion[.]"). One officer in pursuit then fired a Bola Wrap at Mr. Root. Though it missed, this action gave non-verbal notice of officers' attempts to use force to apprehend him. *See Palacios v. Fortuna*, 61 F.4th 1248, 1259 (10th Cir. 2023) ("[A] warning does not need to be specifically that officers are about to open fire."). When Mr. Root refused to stop and proceeded to run towards a busy roadway, Officer Comstock made a split-second decision to fire his taser at him. Dkt. 6 at 5; *see Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 761 (10th Cir. 2021) (The "calculus of reasonableness must [also] embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

No one disputes the tragedy that occurred next—Mr. Root's temporary muscular incapacitation resulting from the taser prevented him from breaking his fall, and he fell head-first down a decline, across a sidewalk, and into the street, breaking his neck and rendering him quadriplegic. Dkt. 6 at 5–6. But that devastating outcome does not factor into the analysis which must focus on what the officer knew *before* the decision to use force. *U.S. v. Madrid*, 713 F.3d 1251, 1255 (10th Cir. 2013) (The use of force analysis is an objective standard that asks whether the "facts available to the officer at the moment of the seizure would warrant a man of reasonable caution that the action taken was appropriate.") (cleaned up). And in the totality of circumstances alleged, Officer Comstock's use of force was not unreasonable. Those circumstances included a suspected felon who had struck a police vehicle while fleeing from officers, who had not responded to multiple lesser uses of force, and who was creating an apparent danger to himself and the public by running towards a busy street. Use of a taser in such circumstances was well within the bounds of options a reasonable officer might select.[2] *See Wilson v. City of Lafayette*, 510 F. Appx 775, 777 (10th Cir. 2013) (cert. denied) (Gorsuch J.) (holding that an officer's actions were

---

[2] Mr. Root claims Officer Comstock's use of a taser amounted to deadly force in violation of the Fourth Amendment and Colorado Springs Police Department's procedures. *See* Dkt. 22 at 7–16. But Mr. Root provides no details describing the elevated position he was allegedly in—nothing regarding the height he was at vis-à-vis the ground (or that he was even off the ground), or the degree of decline he was running down—and the cases he cites in support of this claim are remarkably dissimilar to the facts he alleges, *viz.*, he was not on a wall, ledge, ladder, roof, or fence off the ground. *See id.* at 9–10. The danger here was not such that using a taser was likely to cause death.

reasonable and did not amount to excessive force under the Fourth Amendment even though he tased a fleeing felon and one of the taser probes struck the suspect in the head and killed him); *Coronado v. Olsen*, No. 2:18-CV-83, 2020 WL 5821220, at \*6 (D. Utah Sept. 30, 2020), *aff'd*, No. 20-4118, 2022 WL 152124 (10th Cir. Jan. 18, 2022) (finding that officers acted reasonably when they used tasers to stop the advancement of an unarmed and half naked suspect who after being tased, tragically struck his head and suffered a brain injury). Accordingly, Mr. Root's claim of excessive force in violation of the Fourth Amendment must be dismissed.

But even if one concluded Officer Comstock's conduct violates the Fourth Amendment, Mr. Root's claim would still have to be dismissed under the second prong of qualified immunity. *See Heard v. Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022) ("[T]he plaintiff must 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'") (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018). Mr. Root has not provided any cases with facts similar enough to put reasonable officers on notice that use of a taser was unconstitutional in these circumstances. And in fact, the cases show otherwise. *See, e.g., Wilson, Coronado, supra*. Under either prong of qualified immunity, the claim against Officer Comstock must be dismissed.

## II.    Municipal Liability

Under Section 1983, "local governments are responsible only for "their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277,

1284 (10th Cir. 2019). Therefore, to state a plausible claim against the City of Colorado Springs, Mr. Root must show that the execution of an illegal policy inflicted his injury. *Id.* He also "must demonstrate a direct causal link between the policy or custom and the injury alleged." *Id.* at 1284.

Mr. Root's conclusory allegations that the City maintains a general policy that condones and ratifies acts of excessive force are insufficient to state a claim on this basis. The Amended Complaint fails to identify any policy that condones excessive force, and it fails to allege the City's actual excessive force or taser policies are unconstitutional.[3] Instead, Mr. Root relies on ratification and custom or practice theories of liability. As to the former, he alleges that because the City "did not terminate or discipline Defendant Comstock for his actions, … did not recommend any further training or counseling for [him]," and found that his "actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices, and training," then it necessarily has "a custom or policy of using and ratifying excessive force." Dkt. 6 at 7. He states, "[h]ad Defendant Comstock's actions been outside of the policy, disciplinary or remedial action would have been taken." *Id.* This sort of circular reasoning is generally insufficient to establish municipal liability under a ratification theory even if the underlying action was unconstitutional. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 790 (10th Cir. 2010) ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."). But even if a lack of known discipline itself were sufficient in some cases, it is not here because the underlying actions were not unconstitutional.

---

[3] Mr. Root even appears to argue that the City's Use of Force policy was *violated* by Officer Comstock. *See* Dkt. 6 at 1.

Mr. Root also describes nine other incidents he says show the City had a custom or policy of allowing police officers to use excessive force. *See.* Dkt. 6 at 7–16. But while at this stage the Court is required to accept all well-pleaded allegations as true, it need not recognize conclusory statements predicated on dissimilar or dubious examples of excessive force. Even if nine other cases were sufficient in a city the size of Colorado Springs to show an established custom or policy, these cases are not similar enough to do so.[4] *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (noting that when "attempting to prove the existence of such a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way.").

Mr. Root's examples do not show deliberate indifference to the likelihood that force would be used unconstitutionally in these circumstances. Absent this, "the City cannot be held liable for its failure to train or supervise its [police officers because] the City's policymakers [cannot]

---

[4] The examples cited are not similar enough to create municipal liability. Mr. Root's first example does not involve a taser and does not mention the crimes the officers were investigating. Dkt. 6 at ¶ 35. And even there, the officers first ordered the suspect to stop before shooting. *Id.* Mr. Root's second, seventh, and eighth examples do not involve a taser or a fleeing suspect. *Id.* at ¶¶ 36, 41–42. In Mr. Root's third example, the officers, who were investigating a call about an individual with a firearm, gave the suspect, who was not running away, a clear warning before using the taser. *Id.* In Mr. Root's fourth example, which did not involve a taser or a fleeing suspect, the claims of excessive force were dismissed. *Id.* at ¶ 38; *see Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1063 (D. Colo. 2021). Mr. Root's fifth example does not allege a tasing while the suspect was in flight or a failure to warn. Dkt. 6 at ¶ 39. Mr. Root also fails to note that the Tenth Circuit granted the involved officers qualified immunity. *See Est. of Melvin, v. City of Colo. Springs*, No. 23-1070, 2023 WL 8539921, at *6 (10th Cir. Dec. 11, 2023). In the sixth example, the officers did not tase or chase the suspects. Dkt. 6 at ¶ 40. And Mr. Root's ninth example does not allege a flight or a failure to warn. *Id.* at ¶ 43.

reasonably be said to have been deliberately indifferent to the need for further training or supervision." *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (10th Cir. 2010). And because "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] actions that will cause violations of constitutional rights," to survive Defendants' motion to dismiss, Mr. Root must have at least alleged the City was on notice that its "course of training [with respect to tasers was] deficient in a particular respect" and directly caused Mr. Root's injury. *Waller*, 932 F.3d at 1284–85 (cleaned up); *see also Irizarry v. City & Cnty. of Denver*, No. 21-CV-01490-PAB-SKC, 2023 WL 2528782, at *12 (D. Colo. Mar. 15, 2023) (allegations which do not show how a police officer was trained, who trained him, or how his training is deficient, do not state a plausible claim for relief). He has not done so here.

Mr. Root has also not alleged facts that plausibly suggest there was an unofficial widespread custom of using excessive force. On this score, he asserts a single conclusory allegation, *see* Dkt. 6 at ¶ 45, which does not suffice to show a widespread custom. And even if the nine examples Mr. Root describes were on point, it is not clear that would suffice to create municipal liability. Higher courts have not put forward a numerical standard for how many prior cases suffice to show a pattern or practice. *Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1039 (D.N.M. 2019) (quoting *Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir. 1981) ("[T]he mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies.")). Nine is a small numerator over what would be a relatively large denominator—the number of interactions between subjects and police in a city the size of Colorado Springs over fifteen years. *Cf. Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for

establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (explaining that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"). Given this and that the nine examples are not sufficiently similar to Mr. Root's facts, he has not alleged plausible facts to show a widespread custom by the City of using excessive force. Instead, Mr. Root simply states that the City, the police department, and the chief of police "ratified the excessive force of their officers through failure to investigate, failure to counsel, and failure to discipline officers who use excessive force." Dkt. 6 at 24. Without more details, these allegations are conclusory at best and cannot serve as a basis for a claim for relief. Accordingly, Mr. Root's claim against the City of Colorado Springs is dismissed.

## III.    State Claim

Because the federal claims that were the basis for this court's jurisdiction must be dismissed, Mr. Root's state claim against Officer Comstock is also dismissed. 28 U.S.C. § 1367(c)(3); *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010).

### CONCLUSION

It is **ORDERED** that:

Defendants' Motion to Dismiss, **Dkt. 12**, is **GRANTED** and Plaintiff's complaint is dismissed without prejudice.

DATED: March 3, 2025                     BY THE COURT:

Daniel D. Domenico
United States District Judge