# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

Jacob Root
*Plaintiff-Appellant.*
v.
Officer Robert Comstock, et al.
*Defendant-Appellees.*

On Appeal from
The United States District Court
**District of Colorado**
The Honorable
Judge Daniel D. Domenico
District Court Case No.:
1:24-cv-01293-DDD-TPO

## APPELLANT'S APPENDIX
VOLUME I, pages 1 - 72

Law Offices of Harry M. Daniels, LLC

Harry M. Daniels, Jr.
Georgia Bar 234158
4751 Best Rd. Suite 490
Atlanta, Georgia 30337
Telephone: (678) 664-8529 Facsimile:
(800) 867-5248
daniels@harrymdaniels.com

JOLLY LAW, P.L.L.C

Tyler A. Jolly, #52361
9996 W U.S. Highway 50, Unit 1090
Salida, CO 81201
Phone: 719-429-7359
Tyler@jollylawcolorado.com

# INDEX
# VOLUME I

DOCKET REPORT.............................................................................................. 1

SECOND AMEND COMPLAINT (Dkt. 6), 05/16/2024………........................... 6

DEFENDANTS' MOTION TO DISMISS (Dkt. 12), 07/29/24.............................33

EXHIBIT 1 TO  PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS (Dkt. 22-1), 08/19/2024.......................................................................... 49

ORDER GRANTING MOTION TO DISMISS (Dkt. 29), 03/03/2025................. 58

NOTICE OF APPEAL (Dkt. 31), 03/28/2025...................................................... 71

ALLMTN,APPEAL,JD1,MJ CIV PP,STAYDI,TERMED

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:24-cv-01293-DDD-TPO

Root v. Comstock et al
Assigned to: Judge Daniel D. Domenico
Referred to: Magistrate Judge Timothy P O'Hara
Demand: $100,000,000
Case in other court: USCA-10th Circuit, 25-01123
Cause: 42:1983 Civil Rights Act

Date Filed: 05/09/2024
Date Terminated: 03/05/2025
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

### Plaintiff

**Jacob Root**
represented by **Tyler A. Jolly**
Jolly Law PLLC
9996 West US Highway 50
Suite 1090
Salida, CO 81201
719-429-7359
Email: tyler@jollylawcolorado.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Harry M. Daniels , Jr**
Law Offices of Harry M. Daniels, LLC
4751 Best Road
Suite 490
Atlanta, GA 30337
678-664-8529
Email: daniels@harrymdaniels.com
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Robert Comstock**
*Officer; in his individual capacity*
represented by **Brian Matthew Stewart**
Colorado Springs City Attorney's Office
30 South Nevada Avenue
Suite 501
Colorado Springs, CO 80903
719-385-5909
Email:
Brian.Stewart@coloradosprings.gov

VOL. I, 1

*ATTORNEY TO BE NOTICED*

**Defendant**

**Colorado Springs, Colorado, City of**
*a municipality*

represented by **Brian Matthew Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/09/2024 | 1 | COMPLAINT against Robert Comstock (Filing fee $ 405,Receipt Number ACODC-9678967)Attorney Tyler A. Jolly added to party Jacob Root(pty:pla), filed by Jacob Root. (Attachments: # 1 Civil Cover Sheet)(Jolly, Tyler) (Entered: 05/09/2024) |
| 05/09/2024 | 2 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES re: 1 Complaint filed by attorney *Tyler A. Jolly*. Attorney or pro se has used an incorrect signature format in violation of D.C.COLO.LCivR 5.1(a) and 4.3(a) of the Electronic Case Filing Procedures (Civil cases). **DO NOT REFILE THE DOCUMENT.** In the future, the filer must affix an electronic /s/ signature followed by a typed, not an inked, signature to all future documents. (Text Only Entry) (blaws) (Entered: 05/09/2024) |
| 05/09/2024 | 3 | Case assigned to Magistrate Judge Michael E. Hegarty. Text Only Entry. (blaws) (Entered: 05/09/2024) |
| 05/09/2024 | 4 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. No summons issued. (blaws) (Entered: 05/09/2024) |
| 05/10/2024 | 5 | MINUTE ORDER: Magistrate Consent Form due **7/11/2024**. Proposed Scheduling Order due **7/11/2024**. Scheduling Conference **set for 7/18/2024 10:00 AM** in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. Entered by Magistrate Judge Michael E. Hegarty on 5/10/2024. (dgumb, ) (Entered: 05/10/2024) |
| 05/16/2024 | 6 | AMENDED COMPLAINT against Robert Comstock, Colorado Springs, Colorado, City of, filed by Jacob Root.(Jolly, Tyler) (Entered: 05/16/2024) |
| 05/21/2024 | 7 | SUMMONS REQUEST as to Defendant Comstock, Defendant City of Colorado Springs by Plaintiff Jacob Root. (Attachments: # 1 Summons)(Jolly, Tyler) (Entered: 05/21/2024) |
| 05/22/2024 | 8 | SUMMONSES issued by Clerk. (Attachments: # 1 Summons) (dgumb, ) (Entered: 05/22/2024) |
| 06/03/2024 | 9 | WAIVER OF SERVICE Returned Executed by Jacob Root. Colorado Springs, Colorado, City of waiver sent on 5/30/2024, answer due 7/29/2024; Robert Comstock waiver sent on 5/30/2024, answer due 7/29/2024. (Attachments: # 1 Waiver of Service) (Daniels, Harry) (Entered: 06/03/2024) |
| 06/05/2024 | 10 | NOTICE of Entry of Appearance by Brian Matthew Stewart on behalf of Colorado Springs, Colorado, City of, Robert ComstockAttorney Brian Matthew Stewart added to |

| | | |
|---|---|---|
| | | party Colorado Springs, Colorado, City of(pty:dft), Attorney Brian Matthew Stewart added to party Robert Comstock(pty:dft) (Stewart, Brian) (Entered: 06/05/2024) |
| 06/21/2024 | 11 | MINUTE ORDER: The above captioned case has been directly assigned to Chief Magistrate Judge Michael E. Hegarty pursuant to D.C.COLO.LCivR 40.1. Magistrate Consent Form due **7/30/2024**. Proposed Scheduling Order due **7/30/2024**. Scheduling Conference **reset for 8/6/2024 10:15 AM** in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. It is ORDERED that Plaintiff shall notify all Parties who have not entered an appearance of the date and time of the Scheduling Conference. Entered by Magistrate Judge Michael E. Hegarty on 6/21/2024. (dgumb, ) (Entered: 06/21/2024) |
| 07/29/2024 | 12 | MOTION to Dismiss *Pursuant to Rule 12(b)(6)* by Defendants Colorado Springs, Colorado, City of, Robert Comstock. (Stewart, Brian) (Entered: 07/29/2024) |
| 07/31/2024 | 13 | Proposed Scheduling Order by Plaintiff Jacob Root. (Daniels, Harry) (Entered: 07/31/2024) |
| 08/06/2024 | 14 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Scheduling Conference held on 8/6/2024. FTR: A501. (cthom, ) (Entered: 08/06/2024) |
| 08/06/2024 | 15 | SCHEDULING ORDER by Magistrate Judge Michael E. Hegarty on 8/6/2024. (cthom, ) (Entered: 08/06/2024) |
| 08/09/2024 | 16 | MOTION to Stay *Discovery* by Defendants Colorado Springs, Colorado, City of, Robert Comstock. (Stewart, Brian) (Entered: 08/09/2024) |
| 08/09/2024 | 17 | MINUTE ORDER: This matter comes before the Court on the Parties' failure to file the consent form by the Court-ordered deadline of July 30, 2024. ECF 11 . The Parties shall file the magistrate judge consent form (ECF 4 ) indicating unanimous consent or a Party's non-consent on or before **this Monday, August 12, 2024**. Entered by Chief Magistrate Judge Michael E. Hegarty on 8/9/24. Text Only Entry (mehlc8) (Entered: 08/09/2024) |
| 08/12/2024 | 18 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Jacob Root All parties do not consent.. (Daniels, Harry) (Entered: 08/12/2024) |
| 08/12/2024 | 19 | MINUTE ORDER: Pursuant to the consent form filed by the Parties declining consent under D.C.COLO.LCivR 40.1(c) [ECF 18 ], the Court directs the Clerk of the Court to **reassign** this case under D.C.COLO.LCivR 40.1(a). This Court may continue on the case to hear matters referred by the district judge under 28 U.S.C. § 636(b), Fed. R. Civ. P. 72, and D.C.COLO.LCivR 72.1(c). Entered by Magistrate Judge Michael E. Hegarty on 8/12/2024. (dgumb, ) (Entered: 08/12/2024) |
| 08/12/2024 | 20 | CASE REASSIGNED. Pursuant to 18 Consent to Jurisdiction of Magistrate Judge. This case is randomly reassigned to Judge Daniel D. Domenico and drawn to Magistrate Judge Michael E. Hegarty. All parties do not consent. All future pleadings should be designated as **24-cv-1293-DDD**. (Text Only Entry) (dgumb, ) (Entered: 08/12/2024) |
| 08/12/2024 | 21 | ORDER REFERRING CASE to Magistrate Judge Michael E. Hegarty. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to |

| | | the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions, and (5) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. SO ORDERED by Judge Daniel D. Domenico on 8/12/2024. Text Only Entry. (rkeec) (Entered: 08/12/2024) |
|---|---|---|
| 08/19/2024 | 22 | RESPONSE to 12 MOTION to Dismiss *Pursuant to Rule 12(b)(6)* filed by Plaintiff Jacob Root. (Attachments: # 1 Exhibit Colorado Springs Police Department Conducted Energy Weapon Policy)(Daniels, Harry) (Entered: 08/19/2024) |
| 08/19/2024 | 23 | RESPONSE to 16 MOTION to Stay *Discovery* filed by Plaintiff Jacob Root. (Daniels, Harry) (Entered: 08/19/2024) |
| 08/21/2024 | 24 | ORDER REFERRING MOTION: 16 Motion to Stay *Discovery* filed by Colorado Springs, Colorado, City of, Robert Comstock. Motion referred to Magistrate Judge Michael E. Hegarty by Judge Daniel D. Domenico on 8/21/2024. Text Only Entry (dddlc1, ) (Entered: 08/21/2024) |
| 08/30/2024 | 25 | REPLY to Response to 12 MOTION to Dismiss *Pursuant to Rule 12(b)(6)* filed by Defendants Colorado Springs, Colorado, City of, Robert Comstock. (Stewart, Brian) (Entered: 08/30/2024) |
| 08/30/2024 | 26 | REPLY to Response to 16 MOTION to Stay *Discovery* filed by Defendants Colorado Springs, Colorado, City of, Robert Comstock. (Stewart, Brian) (Entered: 08/30/2024) |
| 09/09/2024 | 27 | ORDER: Before the Court is Defendants' Motion to Stay Discovery. ECF 16 . For good cause shown, the Court hereby grants Defendants' Motion to Stay. ECF 16 . The Court **stays discovery** on all claims until the final ruling on Defendants' Motion to Dismiss [ECF 12 ]. If a final ruling on Defendants' Motion to Dismiss does not entirely dispose of this case, within **five business days** of that ruling, the Parties shall jointly file a proposed briefing schedule and request to lift the stay in this case. Entered by Magistrate Judge Michael E. Hegarty on 9/9/2024.(dgumb, ) (Entered: 09/09/2024) |
| 10/17/2024 | 28 | REASSIGNING MAGISTRATE JUDGE. This action is reassigned to Magistrate Judge Timothy P. O'Hara upon his appointment. All future pleadings should reference Magistrate Judge O'Hara at the end of the civil action number (such as 24-cv-01293-DDD-TPO). Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained and will now be handled by Magistrate Judge O'Hara in Courtroom C-402. His chambers are located in Room C-452 of the Byron G. Rogers Courthouse. His telephone number is 303-335-2740. (Text Only Entry) (sphil, ) (Entered: 10/17/2024) |

| 03/03/2025 | [29](#) | ORDER granting [12](#) Motion to Dismiss. Plaintiff's complaint is dismissed without prejudice. Entered by Judge Daniel D. Domenico on 3/3/2025. (cpear) (Entered: 03/05/2025) |
|---|---|---|
| 03/05/2025 | [30](#) | FINAL JUDGMENT pursuant to [29](#) Order on Motion to Dismiss. Entered by the Clerk of the Court on 3/5/2025. (cpear) (Entered: 03/05/2025) |
| 03/28/2025 | [31](#) | NOTICE OF APPEAL as to [30](#) Judgment, [12](#) MOTION to Dismiss *Pursuant to Rule 12(b)(6)*, [29](#) Order on Motion to Dismiss by Plaintiff Jacob Root (Filing fee $ 605, Receipt Number ACODC-10242121) (Jolly, Tyler) (Entered: 03/28/2025) |
| 03/31/2025 | [32](#) | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the [31](#) Notice of Appeal filed by Jacob Root to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # [1](#) Preliminary Record)(cmadr, ) (Entered: 03/31/2025) |
| 03/31/2025 | [33](#) | USCA Case Number 25-1123 for [31](#) Notice of Appeal filed by Jacob Root. (cmadr, ) (Entered: 04/01/2025) |
| 04/10/2025 | [34](#) | TRANSCRIPT ORDER FORM by Plaintiff Jacob Root. Transcript is not necessary re [31](#) Notice of Appeal. (cmadr, ) (Entered: 04/11/2025) |
| 04/11/2025 | 35 | LETTER TO USCA and all counsel certifying the record is complete as to [31](#) Notice of Appeal filed by Jacob Root. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 25-1123) Text Only Entry (cmadr, ) (Entered: 04/11/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/15/2025 11:53:28 | | |
| **PACER Login:** | harrymdjr123. | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-01293-DDD-TPO |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-1293

JACOB ROOT,

      Plaintiff,

      v.

OFFICER ROBERT COMSTOCK, in his individual capacity;

CITY OF COLORADO SPRINGS, a municipality,

      Defendants.

---

### AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through his attorneys, Tyler A. Jolly and Harry M. Daniels, hereby files this Amended Complaint pursuant to FRCP 15 (a) (1)(B)(2) and LCivR 15.1(a), and respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

*Prior to using force, an officer shall identify himself or herself as a peace officer. The officer shall give a clear verbal warning of their intent to use force.*

***Colorado Springs Police Department General Order 500 Use of Force Policy.***
***Effective Date: 8/2/2021***

1. On May 16, 2022, Officer Robert Comstock of the Colorado Springs Police Department shot Jacob Root in the back with his TASER weapon while Mr. Root was running away from him. Officer Comstock did not give Mr. Root any prior warning that he would use his TASER weapon before shooting Mr. Root in the back.

2. Jacob Root was shot in the back, experienced muscular incapacitation, fell face first to the ground, and broke his neck. Jacob Root is now a quadriplegic.

3. Plaintiff seeks compensatory and punitive damages against the Defendant.

4. TRIAL BY JURY IS DEMANDED.

## JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. §1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §1331. Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. §1988.

6. Jurisdiction for Plaintiff's supplemental state law claim, brought under Colorado state law, including the Colorado Enhance Law Enforcement Integrity Act, C.R.S §13-21-131 *et. seq.* is conferred by 28 U.S.C §1367.

7. Venue is proper in the District of Colorado pursuant to 28 U.S.C. §1391(b). All events alleged herein occurred within the State of Colorado.

## PARTIES

8.  At all times pertinent to the subject matter of this litigation, Plaintiff Jacob Root (hereinafter Plaintiff or Mr. Root) was a citizen of the United States of America and a resident of, and domiciled in, the State of Colorado.

9.  Defendant City of Colorado Springs, Colorado, is a municipality organized under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. §1983. The Colorado Springs Police Department ("CSPD") is a law enforcement agency that is part of the City of Colorado Springs.  Defendant City of Colorado Springs is responsible for the oversight, supervision, discipline, and training of CSPD officers including Defendant Robert Comstock.

10. At all relevant times, Defendant Robert Comstock (hereinafter Defendant Comstock) was a citizen of the United States and a resident of, and domiciled in, the State of Colorado. At all times pertinent, Defendant Comstock was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer, and Officer Comstock was employed by the Colorado Springs Police Department.

**FACTUAL ALLEGATIONS**

11. On May 16, 2022, thirteen law enforcement officers across three agencies (Colorado Springs Police Department, El Paso County Sheriff's Office, and Colorado State Patrol) were working together as part of the "BATTLE" (Beat Auto Theft Through Law Enforcement) task force.  Defendant Comstock was working as a member of the BATTLE task force as part of the Colorado Springs Police Department.

12. The task force officers had received a report that a 2017 Ford Fusion had been stolen
    about 10 days prior on May 6th, 2022.  The complaining witness alleged that her car was
    stolen from a parking lot near her home sometime during the night of May 6th.  The
    complaining witness informed law enforcement that she had left the car unlocked with a
    key fob inside.

13. On May 16, 2022, members of the task force discovered the 2017 Ford Fusion in the
    parking lot of the Super 8 Motel at 1790 Aeroplaza Dr. in Colorado Springs.  The Ford
    Fusion was unoccupied.

14. Rather than recover the unoccupied car, the task force members affixed a tracking device
    to the car.  Thereafter, task force members followed the Ford Fusion to a Kum & Go gas
    station at 3208 North Nevada Ave. and then to the Aspen Lodge Hotel at 3990 North
    Nevada Ave.

15. Once at the Aspen Lodge, task force members located the Ford Fusion, which was again
    unoccupied.  Rather than seize the unoccupied car, task force members waited for the
    driver to return and enter the car.

16. At that point, task force members drove multiple vehicles into the parking lot of the
    Aspen Lodge.  The task force members attempted to block the car from leaving the
    parking lot.  However, Colorado Springs Police Officer Leigh Avila described the Ford
    Fusion being able to get around her police cruiser, colliding and causing damage to her
    front passenger bumper in the process.  The task force officers did not immediately
    pursue the Ford Fusion.

17. Officers later tracked the Ford Fusion to a Kum & Go gas station at 2588 Airport Road in Colorado Springs.  Upon arrival, the Ford Fusion was parked on the east side of the building and Mr. Root was inside the car.

18. Officers watched Mr. Root get out of the car and enter the gas station.  While Mr. Root was in the gas station, the task force members surrounded the building and parking lot. The task force officers did not enter the gas station while Mr. Root was inside.

19. Defendant Comstock parked his car at the southwest corner of the gas station and walked towards the front entrance to the gas station.

20. Mr. Root exited the gas station holding a ½ gallon of milk in his hand.  Upon seeing the officers, Mr. Root began to run past the gas pumps and towards the sidewalk on Airport Road.

21. As Mr. Root was running, Colorado State Patrol Detective Wolff shot at Mr. Root with a "Bola Wrap."  Meanwhile, Defendant Comstock began to chase Mr. Root on foot.

22. Defendant Comstock drew his TASER weapon while chasing Mr. Root from behind in the gas station lot.  Mr. Root then began running down the elevated slope dividing the gas station from the sidewalk on Airport Road.  The slope dividing the gas station from the sidewalk was covered in dirt and uneven rocks.

23. Defendant Comstock pointed his TASER weapon at Mr. Root's back as he ran down the slope. Then, without warning Mr. Root that he would use his TASER weapon, Defendant Comstock shot Mr. Root in the back.  Mr. Root experienced muscular incapacitation upon

being shot with the TASER.  Mr. Root, who could not use his hands or arms to break his

fall, fell head-first down the decline, across the sidewalk, and off the curb down into the

street.

24. Mr. Root remained face down in the street, face bloodied and groaning in agony, as

officers surrounded him and placed him in handcuffs.  Mr. Root, who broke his neck

during the fall, told the officers as they handcuffed him that he could not move.

25. Mr. Root did *not* have any weapon at the Kum & Go gas station.  Mr. Root did *not* make

any verbal threat that he was armed or that he intended to use force against any officer or

other person at the Kum & Go gas station.  Mr. Root did *not* use or attempt to use force

against any officer or other person at the Kum & Go gas station.  Mr. Root was running

away from Defendant Comstock when he was shot in the back.

26. Mr. Root's injuries include but are not limited to: quadriplegia, loss of constitutional and

federal rights, physical injuries, impairments and disfigurement, great pain and emotional

distress, and/or aggravation of pre-existing conditions, and ongoing special damages

medically/psychologically related treatment caused by the unconstitutional and moving

forces concerted conduct of all the Defendant.

27. Mr. Root also continues to suffer ongoing emotional distress, with significant PTSD-type

symptoms, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness,

nightmares and flashbacks from this unlawful use of force.

28. Mr. Root is also entitled to punitive damages on all of his claims against Defendant Comstock personally to redress his willful, malicious, wanton, reckless, and fraudulent conduct.

**Defendant Colorado Springs is municipally liable for Defendant Comstock's actions and has a custom and practice of using and ratifying excessive force.**

29. It has long been the custom and actual practice of CSPD to engage in, encourage, and condone the use of excessive force by CSPD officers.

30. Colorado Springs did not terminate or discipline Defendant Comstock for his actions against Mr. Root. Further, CSPD did not recommend any further training or counseling for Defendant Comstock, despite his actions against Mr. Root.

31. Colorado Springs' and the CSPD's official position regarding the shooting of Mr. Root in the back, causing him to fall and break his neck, was and is that Defendant Comstock's actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices and training of the City of Colorado Springs and the CSPD.

32. This ratification of the conduct that caused Mr. Root's quadriplegia is not alleged as proof that this ratification itself "caused" Mr. Root's injuries. Rather, it evidence that the conduct was engaged in pursuant to policy, custom, and practice of the CSPD. Had Defendant Comstock's actions been *outside* of the policy, disciplinary or remedial action would have been taken.

33. Defendant Comstock acted intentionally, knowingly, willfully, wantonly, maliciously and/ or recklessly in disregard to Mr. Root's federal protected rights, and acted under the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Colorado Springs acting under color of state law.

34. The custom and practice of excessive force is evidence by a considerable number of other events, as detailed in at least the following examples:

**De'Von Bailey**

35. In 2019, CSPD officers shot and killed De'Von Bailey, a 19-year-old.  Mr Bailey was shot in the back as he ran from officers.  The officers involved gave orders for Mr. Bailey to stop running, but the officers gave no warning that they intended to shoot nor use deadly force against Mr. Bailey as he ran away.  Multiple witnesses stated that Mr. Bailey did not look back toward the officers, nor did Mr. Bailey make any threatening gesture or motion towards the officers as he ran away.  Nevertheless, the officers shot Mr Bailey in the back.  The CSPD's official position was that the conduct of the officers involved in shooting Mr. Bailey in the back was appropriate, consistent with, and engaged in pursuant to all approved police policies, practices, and training of the City of Colorado Springs and the CSPD.  Despite the position of the CSPD, the City of Colorado Springs agreed to settle with the estate of Mr. Bailey for nearly 3 million dollars.

**Dalvin Gadson**

36. On October 9, 2022, CSPD officers violent beat Dalvin Gadson, a homeless United States veteran.  Mr. Gadson was stopped by CSPD officers for failing to display a license plate

on his vehicle.  However, when Mr. Gadson questioned why he was being told to get out

the car, CSPD officers attempted to physically remove him from the car.  The CSPD

officers did not provide any warning of their intention to use physical force against Mr.

Gadson.  The CSPD officers proceeded to punch and knee Mr. Gadson more than twenty

times.  Mr. Gadson suffered a traumatic brain injury as a result of the excessive force by

the CSPD officers.  However, the Colorado Springs Police Department asserted that the

officers involved had not violated any CSPD policy, and the officers remained in good

standing with CSPD.  Nevertheless, the City of Colorado Springs has agreed to pay 2.1

million dollars as a settlement in Mr. Gadson's case.

**Tyrone Moss**

37. On March 12, 2022, CSPD officers responded to a reported disturbance at Wood's Bar

and Grill.  Once there, the CSPD officers began investigating a man in a white hoody

who was allegedly in possession of a firearm.  That person was not Mr. Moss, and CSPD

officers had no evidence that Mr. Moss was engaged in any crime.  Mr. Moss was near

the scene of the investigation, and he simply began walking away.  CSPD officers

ordered Mr. Moss to stop walking away.  Mr. Moss complied and turned around to face

the officers.  The officers then threatened to use their TASER weapons on Mr. Moss.  Mr.

Moss asked, "For what?"  The officers then proceeded to shoot Mr. Moss with a TASER

weapon.  Again, the City of Colorado Springs took the position that the officers were

acting within the scope of their employment and acting in good faith.  On information

and belief, the City of Colorado Springs has agreed to settle this case with Mr. Moss.

**Michael Sexton**

38. On June 7, 2019, Michael Sexton flipped the middle finger to a CSPD officer as the officer drove by on the street and as Mr. Sexton stood on the sidewalk.  The CSPD officer got out of his car, grabbed Mr. Sexton by the arm, and forced Mr. Sexton against his patrol car.  The CSPD officer then claimed that his use of force against Mr. Sexton was due to Mr. Sexton jaywalking.  The CSPD officer was not disciplined for his wrongful arrest, clear violation of the First Amendment, and unlawful use of force.  On information and belief, the City of Colorado Springs settled the lawsuit filed by Mr. Sexton.

**Jeffrey Melvin**

39. On April 26, 2018, CSPD officers responded to a noise violation at an apartment complex in Colorado Springs.  After the officers had determined that no crime had been committed, there was no ongoing crime, and those present did not have outstanding warrants, they encountered Jeffrey Melvin, Jr., a young black man arriving at the apartment.  The officers had no reason to believe that Mr. Melvin had been or was about to be engaged in any criminal activity.  The two officers nevertheless attempted to arrest Mr. Melvin.  While attempting to unlawfully arrest Mr. Melvin—without probable cause to believe that he had committed any crime—these officers used overwhelming force against him.  The officers aggressively manhandled Mr. Melvin, threw him to the ground, and repeatedly tased him.  Mr. Melvin briefly escaped the officers' wholly unconstitutional assault, only to collapse from the extreme trauma the officers had inflicted on him.  He was rushed to the hospital, but Mr. Melvin never regained

consciousness and died from his injuries days later, at the age of 27.  This excessive force

is the subject of the federal civil rights action captioned *Estate of Jeffrey Melvin, Jr. v.

Colorado Springs, et al.*, Case no. 20-cv-00991-CMA- KMT (D. Colo. 2020).

**Ryan and Joey Brown**

40. On March 25, 2015, brothers Ryan and Joey Brown were pulled over by CSPD officers.

The brothers were young black men who were driving to their home.  CSPD officers had

no grounds on which to pull them over, and officers would not tell the Brown brothers

why they had been pulled over.  Instead, the officers held them at taser- and gunpoint.

Though the brothers had done nothing wrong, the officers ordered them out of their car at

gunpoint, frisked them, threw Ryan to the ground and threw his phone away to stop him

from recording the interaction. The officers wrongfully arrested both brothers, and CSPD

responded to the brothers' complaint about their mistreatment by determining that the

officers conduct was within official policy and justified.  Colorado Springs paid $212,000

and made substantial policy changes to settle the Brown brothers' claims.

**Grant Bloomquist**

41. In 2013, CSPD officers arrested Grant Bloomquist without probable cause after he

verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr.

Bloomquist was outside Cowboys Night Club in Colorado Springs and saw officers

brutally beating an African American man, so he stepped to about 7 feet away and said,

"get the fuck off him."  At that point, he was blindsided and struck by an officer, who hit

him in the face.  Multiple CSPD officers struck Mr. Bloomquist repeatedly in the groin

area with knee strikes and pinned him against a police vehicle.  The officers then threw

him in the police car and arrested him.  Colorado Springs settled a lawsuit based on

CSPD officers' conduct against Mr. Bloomquist in 2016.

**John Sturgis**

42. On January 26, 2012, CSPD officers arrested John Sturgis without probable cause and

subjected him to excessive force while investigating Mr. Sturgis as a homicide suspect.

Mr. Sturgis was not the perpetrator of any crime.  A witness had allegedly told CSPD

officers he had seen a man at a gas station—Mr. Sturgis—who he claimed resembled a

homicide suspect.  Mr. Sturgis in fact was twice the age of the suspect (40 vs 20), was

bald when the suspect had hair, and exhibited many other physical dissimilarities with the

suspect.  Despite these obvious differences, officers followed Mr. Sturgis and arrested

him.  Mr. Sturgis surrendered peacefully and asked the officers not to handcuff him

behind his back because he had recently had surgery on his shoulder; he even offered to

show the officers MRI images of his injured shoulder that were sitting on the front seat of

his car as proof.  The officers ignored Mr. Sturgis's pleas, and excessively forcefully

handcuffed him behind the back despite his pleas not to do so, causing Mr. Sturgis to

significantly reinjure his shoulder and require further surgery. Several officers falsified

their reports about the incident to invent probable cause to arrest Mr. Sturgis.  Colorado

Springs determined that the officers' conduct was within policy, but paid $300,000 to

settle Mr. Strugis's claims.

**Douglas Sellier**

43. On June 2, 2009, CSPD officers came to Douglas Sellier's home to retrieve Mr. Sellier's

grandson.  When Mr. Sellier insisted that the man to whom the officers were bringing the

child was a sex offender, the officers told Mr. Sellier he was under arrest.  Officers

grabbed Mr. Sellier.  He lost consciousness and came to while pinned on the ground by

CSPD officers.  While Mr. Sellier was pinned to the ground, a CSPD officer punched him

three times in the shoulder and another officer deployed his taser on Mr. Sellier twice.

Mr. Sellier filed suit, arguing that CSPD officers had used excessive force against him.

After a federal judge denied the Defendants' motion for summary judgment, Colorado

Springs settled Mr. Sellier's clams for $50,000.  Colorado Springs argued that the police

officers conduct was within police department policy and appropriate.  Colorado Springs

never disciplined or counseled the CSPD officers involved.

44. Several of these representative cases resulted in Colorado Springs paying substantial

monetary sums to settle police misconduct and excessive force claims.  Yet, the facts

surrounding Mr. Root's case make clear that the Colorado Springs Police Department has

yet to adequately train and supervise its officers regarding the appropriate and legal use

of force or otherwise ensure that the ongoing custom and practice of police using

excessive force, as occurred here, ends.

45. Defendant Colorado Springs knew, based on its long history and widespread practice of

its officers using excessive force and its condoning of those actions, that its officers

would likely use excessive and unnecessary force against persons like Mr. Root.

46. Knowing this, Defendant Colorado Springs could have, and should have, pursued

reasonable methods for training and supervising CSPD officers, including the individual

Defendant, in not using excessive force, but it failed to do so.

47. Defendant Colorado Springs has a policy that trains and tolerates its officers who use

excessive and deadly force, even under circumstances where the officer or a third party is

not at the time in imminent risk of death or serious bodily injury.

48. Additionally, on information and belief, Defendant Comstock, in 2021, previously shot

and killed another individual while on duty, Ahmad Akeem Abdul Muhammad.  CSPD

determined that Defendant Comstock had acted within CSPD policy and training in

killing Mr. Muhammad.

49. Because Defendant Colorado Springs created and tolerated a custom of deliberate

indifference and failed to adequately train and supervise CSPD officers in the

constitutional use of force, individuals, like Mr. Root, have repeatedly been subjected to

violations of their constitutional rights.

50. Defendant Colorado Springs fostered a policy of inaction in the face of knowledge that

CSPD officers were frequently violating specific constitutional rights under the Fourth

and Fourteenth Amendments to the United States Constitution, which is the functional

equivalent of a decision by Colorado Springs itself to violate the Constitution.

51. Defendant Colorado Springs's "policy of inaction" and policies, customs, or practices in

failing to properly train and supervise its employees were a moving force and proximate

cause of Individual Defendant's violation of Mr. Root's constitutional rights.

52. CSPD has persistently failed to counsel or discipline CSPD officers for their similar uses of excessive force.  Colorado Springs's failure to find wrongdoing and failure to counsel or discipline Defendant Comstock in this case, the cases described above, and others reflects a custom, policy, or practice of encouraging, tolerating, and ratifying blatantly illegal conduct.  These encouragements, toleration of, and ratifications show that CSPD officers carry out such police misconduct under the policies of and regimen of training provided by Colorado Springs, and that such conduct is customary within CSPD.  The failure to find wrongdoing, failure to counsel, and failure to discipline serve as a ratification by Defendant Colorado Springs, CSPD, and the CSPD Chief of Police, as a decision-maker and policy-maker for the CSPD, of the illegal conduct of CSPD officers.

53. Despite being on notice from prior lawsuits, press, and settlements that continued tolerance of violations of constitutional rights was substantially certain to result in a constitutional injury like that suffered by Mr. Root here, Colorado Springs has consciously chosen not to remedy its deficient customs and chosen to instead ignore the risk of harm caused by the customs

54. CSPD's approval and defense of the use of excessive force by CSPD employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually *trains* CSPD law enforcement officers—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future.

55. Colorado Springs is responsible for training its officers to ensure they perform their

duties consistent with the law and to discipline their improper conduct, so officers can

learn from their experiences and be deterred from engaging in future misconduct that

violates the constitutional rights of people with whom the police interact.  Colorado

Springs's failure to do so has communicated to, and trained, CSPD officers, including

Defendant Comstock, that excessive force is authorized and tacitly (or explicitly)

encouraged. The failure to counsel or discipline misconduct constitutes training which

causes future similar unconstitutional conduct.

56. Colorado Springs' past ratification and toleration of similar unconstitutional conduct thus

caused and was the moving force behind the Individual Defendant's use of excessive

force against Mr. Root, and Colorado Springs' failure to discipline the Individual

Defendant for this illegal use of force will lead to more unconstitutional conduct.

57. Defendant Colorado Springs' acts or omissions caused Mr. Root damages, because he

suffered quadriplegia, physical and mental pain, humiliation, fear, anxiety, loss of

enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity,

among other injuries, damages, and losses.

58. Defendant Colorado Springs' actions, as described, deprived Mr. Root of the rights,

privileges, liberties, and immunities secured by the Constitution of the United States of

America and caused hum other damages.

## **STATEMENT OF CLAIMS FOR RELIEF**

## **FIRST CLAIM FOR RELIEF**
### **42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment**

**(Jacob Root Against Defendant Comstock)**

59. Plaintiff here incorporates paragraphs 1-58 of this Complaint as if fully set forth herein.

60. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress....

61. Plaintiff in this action is a citizen of the United States and Defendant Comstock is a "person" within the meaning of Title 42 U.S.C. §1983.

62. Defendant Comstock acted under color of state law, within the course and scope of his employment, and in his capacity as an officer of the Colorado Springs Police Department at all times relevant to the allegations in this Complaint. Further, Defendant Comstock's acts or omissions were conducted within the scope of his official duties or employment.

63. At the time of the complained events, Plaintiff had a clearly established constitutional right under the Fourth Amendment, as incorporated against the states under the Fourteenth Amendment, to be secure in his person from unreasonable seizure through excessive force.

64. Plaintiff also had the clearly established Constitutional right under the Fourth Amendment to bodily integrity and to be free from excessive force by law enforcement.

65. Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

Defendant Comstock used force against Mr. Root without warning Mr. Root that he intended to use his TASER weapon.  Further, Defendant Comstock shot Mr. Root in the back with his TASER weapon while Mr. Root was on elevated, uneven surface where a fall was likely to cause substantial injury or death.

66. The Defendant's actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him and violated these Fourth Amendment rights of Plaintiff.

67. The Defendant's actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights.  The force used by Defendant Comstock shocks the conscience and violated these Fourth Amendment rights of Plaintiff.

68. Defendant Comstock unlawfully seized the Plaintiff by means of objectively unreasonable, excessive and conscious-shocking physical force, thereby unreasonably restraining Plaintiff of his freedom.

69. Defendant Comstock's use of force caused serious bodily injury to Plaintiff.  Specifically, Defendant Comstock's use of force resulted in the lifetime physical impairment and quadriplegia of Mr. Root.

70. Defendant Comstock engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

71. Defendant Comstock acted with shocking and willful indifference to Plaintiff's rights and
his conscious awareness that he would cause Plaintiff severe physical and emotional
injuries.

72. The acts or omissions of Defendant Comstock were moving forces behind Plaintiff's
injuries.

73. The acts or omissions of Defendant Comstock as described herein intentionally deprived
Plaintiff of his constitutional rights and caused him other damages.

74. The Defendant is not entitled to qualified immunity for his actions.

75. As a proximate result of Defendant Comstock's unlawful conduct, Plaintiff has suffered
actual physical and emotional injuries, and other damages and losses as described herein
entitling him to compensatory and special damages, in amounts to be determined at trial.
As a further result of the Defendant's unlawful conduct, Plaintiff has incurred special
damages, including medical-related expenses and may continue to incur further medical
and other special damages-related expenses, in amounts to be established at trial.

76. On information and belief, Plaintiff will suffer substantial lost future earnings and
impaired earnings capacities from the not yet fully ascertained and in amounts to be
ascertained in trial.  Plaintiff is further entitled to attorneys' fees and costs pursuant to 42
U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.  There may
also be special damages for lien interests.

77. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendant Comstock under 42 U.S.C. §1983, in that the actions of Defendant Comstock have been taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

78. The intentional actions or inactions of Defendant Comstock as described herein intentionally deprived Mr. Root of due process and of rights, privileges, and immunities secured by the Constitution of the United States of America.

### SECOND CLAIM FOR RELIEF

### Colo. Rev. Stat. § 13-21-131

### Colorado Constitution Article II, Section 7 – Excessive Force/Unlawful Use of Force

### (Jacob Root Against Defendant Comstock)

79. Plaintiff hereby incorporates paragraphs 1-58 as if fully set forth herein.

80. Article II Section 7 of the Colorado Constitution forbids unreasonable seizures, which includes seizures carried out with excessive force.

81. Pursuant to C.R.S. § 13-21-131:

> (1) A peace officer, as defined in section 24-31-901 (3), who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

> (2)(a) Statutory immunities and statutory limitations on liability, damages, or attorney fees do not apply to claims brought pursuant to this section. The "Colorado Governmental Immunity Act", article 10 of title 24, does not apply to claims brought pursuant to this section.

> (b) Qualified immunity is not a defense to liability pursuant to this section.

82. Under CRS 18-1-707(1)

>   Peace officers, in carrying out their duties, shall apply nonviolent means, when possible, before resorting to the use of physical force. A peace officer may use physical force only if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the peace officer or another person.

83. No reasonable law enforcement officer would consider the Defendant's use of his TASER weapon, without any warning and while Mr. Root was at risk of sustaining serious injury or death due to a fall, to have been reasonable or justified under the circumstances. Additionally, Defendant Comstock's actions were in blatant disregard for his own agency's policies.

84. Defendant Comstock violated the Colorado Springs Police Department Conducted Electrical Weapon policy by shooting his TASER weapon without warning and while Mr. Root was on an elevated, uneven surface where a fall was likely to cause substantial injury or death.

85. Article II Section 7 of the Colorado Constitution forbids unreasonable seizures, which include seizures carried out with excessive force, like this one.

86. The Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's rights under Article II Section 7 of the Colorado Constitution.

87. Defendant Comstock's unjustified, violent use of force and seizure of Mr. Root caused Mr. Root to fall, breaking his neck, resulting in his quadriplegia. Mr. Root experienced great physical pain, injury, terror, and was exposed to great risk of death. Defendant

Comstock's actions and inactions are the legal, direct, and proximate cause of Plaintiff's

losses, including but not limited to, Mr. Root's permanent physical disabilities

(quadriplegia), the physical and mental pain and anguish suffered by Mr. Root during the

incident, Mr. Root's continued pain and suffering, Mr. Root's past, present, and future

medical and care costs, Mr. Root's loss of freedom and enjoyment of life, and other

compensatory and special damages including but not limited to Mr. Root's permanent lost

earnings and earnings capacity.  These actions constituted a violation of Mr. Root's rights

secured in Article II, Section 7, 18, and 25 of the Colorado Constitution.

88. Plaintiff further seeks injunctive relief against Defendant Comstock, prohibiting him

from maintaining P.O.S.T. certification.  C.R.S. § 13-21-131(1) authorizes this court,

upon a finding of Defendant's liability, to order "legal or equitable or any other

appropriate relief."  Plaintiff believes this injunctive relief, in the form of revoking

Defendant Comstock's P.O.S.T. certification, would be particularly appropriate in this

action, not only as a sanction for unlawful behavior, but also in an effort to protect the

community from similar injury.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Customs, Policies, Practices, and Ratification**

**(Jacob Root Against Defendant City of Colorado Springs)**

89. Plaintiff hereby incorporates paragraphs 1-58 as if fully set forth herein.

90. Defendant Comstock acted as he did pursuant to, and because of, the customs, policies,

training, and/or practices of Defendant Colorado Springs.

91. Defendant Comstock's actions were the direct result of Defendant Colorado Springs'
promulgation, creation, implementation, or enforcement of policies, customs, or practices
that failed to provide that CSPD officers, including Defendant Comstock, could not use
excessive force on fleeing persons and/or the deliberate choice to follow a course of
action from among various alternatives available to Defendants of not adequately training
or supervising CSPD officers, including Defendant Comstock, regarding the
constitutional use of force, given that the need for such training and supervision was so
obvious, and the inadequacy of training and/or supervision was so likely to result in the
violation of constitutional rights such as those described herein.

92. Defendant Colorado Springs knew to a moral certainty that CSPD officers would be
required to arrest fleeing persons in the execution of their official law enforcement duties.
The City armed its officers with firearms, TASERs, and other weapons. Thus, in light of
the duties and responsibilities of CSPD officers who are inevitably called on to arrest
fleeing persons, the need to train CSPD officers in the constitutional limitations on the
use of force was so obvious that Defendant Colorado Springs's failure to do so
constituted deliberate indifference to Mr. Root's constitutional rights.

93. Defendant Colorado Springs adheres to a policy and practice of permitting the use of
excessive force generally, and specifically on fleeing persons. Adherence to such a
policy makes permissible under official city policy the unconstitutional use of force.

94. Defendant Colorado Springs, through the Colorado Springs Police Department and Chief
of Police (the primary decision-maker and policy-maker of the CSPD), has continually

ratified the excessive force of their CSPD officers through failure to investigate, failure to

counsel, and failure to discipline officers who use excessive force.  The past and present

ratification of excessive force by CSPD and Defendant Colorado Springs condones the

use of excessive force by CSPD officers, including the excessive force used against Mr.

Root.

95. Defendant Colorado Springs knew or should have known that its acts or omissions were

substantially certain to cause CSPD officers including Defendant Comstock to violate

individuals' constitutional rights to be free from excessive force, and they consciously or

deliberately chose to disregard this risk of harm in adhering to their policy, custody, or

practice of failing to provide that CSPD officers can only use force against fleeing

persons only within constitutional limits, and/or in deliberately choosing not to provide

adequate training to CSPD officers in this area.

96. Therefore, Defendant Colorado Springs set in motion a series of events that it knew

would cause an individual in a similar situation as Mr. Root to be deprived of the

constitutional right to be free from excessive force at the hands of law enforcement.  But

for the above acts or omissions of Defendant Colorado Springs, Mr. Root would not have

been subjected to a violation of his Fourth Amendment rights, and such a deprivation was

a proximate cause and a natural and foreseeable consequence of these acts and omissions.

97. As a direct and proximate cause and consequence of Defendants' unconstitutional acts

and omissions, described above, Plaintiff suffered injuries, damages, and losses.

98. The herein described acts or omissions of Defendants are the moving force and the legal, direct, and proximate cause of Plaintiff injuries and losses, including but not limited actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendant's unlawful conduct, Plaintiff has incurred special damages, including medical-related expenses and may continue to incur further medical and other special damages-related expenses, in amounts to be established at trial.

99. The intentional actions or inactions of Defendants as described herein intentionally deprived Mr. Root of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor and against Defendant Comstock and Defendant City of Colorado Springs, and grant him all relief as allowed by law and equity, including by not limited to:

(a) Declaratory and injunctive relief, as appropriate;

(b) Economic losses on all claims allowed by law in the amount to be determined at trial;

(c) Compensatory and consequential damages, including, but not limited to, damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount of $100,000,000;

(d) Compensatory damages, including, but not limited to, damages for the medical costs incurred and future medical and care costs to be incurred by Mr. Root;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, C.R.S. §13-21-131, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the lawful rate;

(h) Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF DEMANDS A TRIAL TO JURY ON ALL ISSUES SO TRIABLE.**

Dated this 16th day of May, 2024.

Respectfully Submitted by Attorneys for Plaintiff:

**JOLLY LAW, P.L.L.C.**

 /s/Tyler A. Jolly

Tyler A. Jolly, #52361
Jolly Law, P.L.L.C.
9996 W U.S. Highway 50, Unit 1090
Salida, CO 81201
Phone: 719-429-7359
Tyler@jollylawcolorado.com

**THE LAW OFFICES OF HARRY M. DANIELS, LLC**

 /s/Harry M. Daniels

VOL. I,032

Harry M. Daniels

4751 Best Road Suite 490
Atlanta, GA 30337
Tel. 678.664.8529
Fax. 800.867.5248
daniels@harrymdaniels.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01293-MEH

JACOB ROOT,

Plaintiff,

v.

OFFICER ROBERT COMSTOCK, in his individual capacity, and
CITY OF COLORADO SPRINGS, a municipality,

Defendants.

---

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

---

Defendants, Officer Robert Comstock and the City of Colorado Springs ("City") by and through the Office of the City Attorney of Colorado Springs, Colorado, move to dismiss Plaintiff's Amended Complaint (ECF 6) ("Complaint") for the reasons stated herein.

### Certification of Conferral Pursuant to Civ. Practice Standard 7.1(a)

Pursuant to this Court's Practice Standards, undersigned conferred on this motion with Plaintiff's counsel via telephone on July 22, 2024. Plaintiff opposes the relief sought herein.

### Introduction and Allegations

On May 16, 2022, Officer Comstock was working as a member of a taskforce dedicated to solving automotive theft crimes. ECF 6 ¶ 11.  On that day, the taskforce was tracking and following a stolen Ford Fusion with the goal of catching the driver. *Id*. ¶¶ 14, 15. To that end, the taskforce tracked the stolen Ford to the Aspen Lodge Hotel and waited for the driver to return to the car. *Id*.

When the driver returned, the taskforce moved in using several vehicles to pin the stolen Ford in and prevent it from leaving. *Id*. ¶ 16. However, the Ford fled, hitting a police cruiser as it evaded the taskforce. *Id*. Instead of chasing the stolen Ford, the taskforce continued to track and follow it until it stopped at the Kum & Go gas station on 2588 Airport Rd. *Id*. ¶ 17. There, they saw Plaintiff get out of the car and go into the convenience store. *Id*. ¶ 18. While Plaintiff was inside, the taskforce surrounded the building. *Id*. When Plaintiff exited the store and saw the officers, he began running away from them and toward Airport Road. *Id*. ¶ 20. Other officers unsuccessfully attempted to stop Plaintiff by shooting a Bola Wrap at him as he fled. *Id*. ¶ 21. Officer Comstock began chasing Plaintiff soon after he started running. *Id*. After Plaintiff successfully evaded the Bola Wrap, Officer Comstock deployed his taser, once, as Plaintiff neared Airport Road. *Id*. Plaintiff fell into the roadway and unfortunately broke his neck. *Id*. ¶ 23.

The Complaint alleges that Officer Comstock used excessive force when he tased Plaintiff without first giving a taser specific warning as he was running down an uneven surface. *Id*. ¶¶ 65, 84. Plaintiff also claims that the City failed to train its officers on the constitutional limits of using a taser on a fleeing suspect. *Id*. ¶¶ 90-99. Plaintiff's claims should be dismissed.

First, Plaintiff has failed to allege facts that show Officer Comstock's actions were unreasonable given the totality of the circumstances. Indeed, Officer Comstock deployed his taser while chasing a felony suspect, who had already evaded less intrusive arrest attempts, and who was fleeing directly toward a public road where he could have put an officer or an innocent motorist in danger of being injured in a traffic accident. As such, Officer Comstock's decision was reasonable under the rapidly evolving circumstances that confronted him. Furthermore, the taskforce's repeated efforts to capture Plaintiff, the presence of multiple officers outside the

convenience store, and the recently fired Bola Wrap, should have sufficiently warned Plaintiff that officers would use force if he continued to flee.[1] As such, Plaintiff's claims should be dismissed.

Second, Plaintiff cannot point to clearly established law that would have informed Officer Comstock that using a taser on a fleeing felony suspect who had just evaded other officers' attempts to stop him, and who was running toward a public road, violated the Fourth Amendment. Because Plaintiff cannot show that Officer Comstock violated clearly established law, he is entitled to qualified immunity and Plaintiff's federal claim against him should be dismissed.

Finally, Plaintiff has not plausibly shown that a City policy caused his alleged constitutional injury. Plaintiff attempts to meet his burden by lodging largely conclusory allegations and noting a smattering of factually dissimilar examples. Indeed, only three of Plaintiff's examples involve officers tasing a suspect, and none claim that the suspect was fleeing when the taser was used. As such, Plaintiff cannot show that the City was aware of, and deliberately indifferent to, the need for more training. Therefore, Plaintiff's claim against the City should be dismissed.

<u>**Argument**</u>

## 1. Standard Of Review

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much

---

[1] Plaintiff only alleges Officer Comstock did not give him a taser-specific warning. ECF 6 ¶ 23. He does not allege that Officer Comstock failed to give him any other warnings, directions, or orders. *Id*.

of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (internal quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting in part Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

## 2. Officer Comstock is Entitled to Qualified Immunity

"When a § 1983 defendant asserts qualified immunity, this affirmative defense "creates a presumption that [the defendant is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). "To overcome this presumption," the plaintiff "must show that (1) the officers'' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1209 (10th Cir. 2017). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Luna*, 577 U.S. at 12 (internal quotations omitted). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments[.]" *Martinez v. Jenneiahn*, No. 22-1219, 2023 WL 4482404, at *2 (10th Cir. July 12, 2023) (internal quotations omitted). Here, the alleged facts fail to satisfy both qualified immunity prongs.

### 2.1.  Officer Comstock Did Not Violate The Fourth Amendment

Allegations of excessive force are analyzed "under the Fourth Amendment's objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[T]he Fourth Amendment does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (internal quotations omitted). When considering the reasonableness of an officer's actions, courts look at three non-exclusive factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. The "calculus of reasonableness must [also] embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 761 (10th Cir. 2021). "Ultimately the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017) (internal quotations omitted).

### 2.1.1.  Officers were investigating felony level crimes

When Officer Comstock deployed his taser, he had reason to suspect Plaintiff of at least two felonies. A person commits Motor Vehicle Theft, a class five felony, if he exercises control over a motor vehicle that belongs to another person without authorization. *See* Colo. Rev. Stat. § 18-4-409 (4)(a) (2022). Vehicular Eluding, also a class five felony, requires a person to drive a motor vehicle in a reckless manner while eluding or attempting to elude a pursuing peace officer. Colo. Rev. Stat. § 18-9-116.5 (2022). According to the Complaint, Officer Comstock was part of

a taskforce that was following the stolen Ford. ECF 6 ¶¶ 12, 14. The taskforce followed the Ford to the Aspen Lodge and waited until the driver returned. [2] *Id*. ¶¶ 15, 16. When the driver got in the car, the taskforce attempted to block the Ford in. *Id*. However, the Ford escaped, striking a police cruiser as it fled the scene. *Id*. The taskforce then tracked the stolen Ford to the Kum & Go on Airport Road. *Id*. ¶ 17. There, taskforce members saw Plaintiff exit the car and go into the convenience store. *Id*. ¶¶ 17, 18. Based on these facts, it was reasonable for every taskforce member to suspect Plaintiff of stealing the Ford and using it to elude officers at the Aspen Lodge. "[O]ur binding precedent indicates the first Graham factor weighs against the plaintiff when the crime at issue is a felony[.]" *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021). As such, the first Graham factor weighs in Officer Comstock's favor.

### 2.1.2. Plaintiff posed an immediate threat to officers and other members of the public

"Our review ... looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Emmett v. Armstrong,* 973 F.3d 1127, 1135 (10th Cir. 2020). Here, the Complaint admits that officers observed Plaintiff in a stolen vehicle that had recently hit a police cruiser. ECF 6 ¶¶ 16-18. This fact alone would lead any reasonable officer to view Plaintiff as a threat, who was willing to harm others to make his getaway. *See Hayenga v. Garth*, No. 18-CV-02038-KLM, 2019 WL 2471086, at *5-6 (D. Colo. June 13, 2019) (knowledge of a suspect's outstanding weapons charges, was a sufficient threat to officer safety to warrant tasing him as he fled). Plaintiff's choice to run toward Airport Road also created an immediate safety risk for himself, officers, and any motorists

---

[2] Plaintiff is the only person that the Complaint places in or even near the stolen Ford Fusion on May 16, 2022. *Id*. ¶¶ 17-18.

traveling on the public roadway. Indeed, Plaintiff was almost to the road, and running directly at it, when Officer Comstock deployed his taser. ECF 6 ¶¶ 22-23. Based on the facts alleged, any reasonable officer would have viewed Plaintiff as an imminent threat to the safety of others. As such, this factor weighs in Officer Comstock's favor.

### 2.1.3.  Plaintiff was attempting to evade officers

"Headlong flight—wherever it occurs—is the consummate act of evasion[.]" *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The Complaint admits that Plaintiff fled from officers as soon as he saw them at the Kum & Go. ECF 6 ¶ 20. Like the previous two factors, this one weighs in Officer Comstock's favor. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993) (finding that officers' decision to use a stun gun on a resisting plaintiff was objectively reasonable even though the other *Graham* factors weighed in the Plaintiff's favor). Furthermore, Plaintiff's immediate decision to run, which was consistent with the Ford's flight from the Aspen Lodge, and his decision to keep running after another officer fired a Bola Wrap at him, forced Officer Comstock to make a "split-second" decision to use his taser as Plaintiff approached Airport Road. Indeed, the circumstances Officer Comstock faced can only be described as uncertain and rapidly changing. While Plaintiff's injuries were tragic, when viewed from the standpoint of a reasonable officer on the scene, Officer Comstock's actions were reasonable. *See Coronado v. Olsen*, No. 2:18-CV-83, 2020 WL 5821220, at *6 (D. Utah Sept. 30, 2020), *aff'd*, No. 20-4118, 2022 WL 152124 (10th Cir. Jan. 18, 2022) (finding that officers acted reasonably when they used tasers to stop the advancement of an unarmed and half naked suspect who after being tased, tragically struck his head and suffered a brain injury). Officer Comstock did not violate the Fourth Amendment.

### 2.1.4.   Plaintiff was warned that officers would use force prior to being tased

The Complaint shows that on May 16, 2022, officers were engaged in an ongoing effort to arrest Plaintiff, and he was engaged in an ongoing effort to thwart their attempts. Notably, the taskforce's first attempt did not use any physical force against Plaintiff. The officers simply tried to prevent the stolen Ford from leaving the Aspen Lodge. ECF 6 ¶ 16. In response to this attempt, force was used against the officers. *Id*. The next attempt occurred at the Kum & Go on Airport Road. There, multiple officers "surrounded the building and parking lot[,]" *id.* at ¶ 18, and "[u]pon seeing [them], [Plaintiff] began to run past the gas pumps and towards the sidewalk . . . ." *Id.* at ¶ 20. Another officer fired the Bola Wrap at the fleeing Plaintiff. Though the Bola Wrap missed, its use warned Plaintiff that officers would use force if he continued to evade them. "[A] warning does not need to be specifically that officers are about to open fire." *Palacios v. Fortuna*, 61 F.4th 1248, 1259 (10th Cir. 2023) (finding in part that officer's commands to "drop the gun" were sufficient warning); *see also Hinton,* 997 F.2d at 781 (officers' use of a stun gun was objectively reasonable to subdue a disorderly plaintiff who was only warned that he would be arrested if he engaged in another outburst). Further, Plaintiff's refusal to surrender to officers' less forceful arrest attempts supports Officer Comstock's reasonable actions. *See Youngquist v. Bd. of Cnty. Commissioners*, 215CV00077BRBSMV, 2016 WL 9725196, at *6 (D.N.M. Dec. 13, 2016) (finding that there was no clearly established law "that using a Taser against a target who refused to obey verbal commands and resisted less forceful attempts to induce compliance constituted excessive force."). Finally, Plaintiff does not make any arguments or allege any facts that suggest a taser-specific warning would have been effective. *See Johnson v. Scott*, 576 F.3d 658, 661 (7th Cir. 2009) (holding that allowing a police dog to bite a felony suspect who had fled from police

was reasonable, even though no verbal warning was given and questioning whether such a warning

would have made a difference). Neither can Plaintiff point to clearly established law that states

such a warning was required in this situation.

### 2.2. Officer Comstock Did Not Violate Clearly Established Law

No published Tenth Circuit or Supreme Court cases put Officer Comstock on notice that

using a taser in this instance, and without giving a taser-specific warning, violates clearly

established law. "Use of excessive force is an area of the law in which the result depends very

much on the facts of each case, and thus police officers are entitled to qualified immunity unless

existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148,

1153 (2018) (internal quotations omitted). "[C]learly established law must be particularized to the

facts of the case, and should not be defined at a high level of generality." *Harris v. Mahr*, 838 F.

Appx 339, 342 (10th Cir. 2020) (internal quotations omitted). "It is not enough that the rule is

suggested by then-existing precedent. The precedent must be clear enough that every reasonable

official would interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*,

583 U.S. 48, 63 (2018). "Accordingly, the plaintiff must 'identify a case where an officer acting

under similar circumstances ... was held to have violated the Fourth Amendment.'" *Heard v.

Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022) (quoting *Wesby*, 583 U.S. at 64).

Here, there is not a Tenth Circuit or Supreme Court decision that states the Fourth

Amendment prohibits an officer from using a taser to stop a fleeing felony suspect who had already

evaded other arrest attempts. To the contrary, in a somewhat similar case, the Tenth Circuit held

that the law in this area is not clearly established. *Wilson v. City of Lafayette,* 510 F. Appx 775, 776

(10th Cir. 2013) (*cert. denied*) (Gorsuch J.) (holding that an officer who tased a fleeing felony

suspect was entitled to qualified immunity, even though one of the taser probes struck the suspect

in the head and killed him). Officer Comstock is entitled to qualified immunity.[3]

### 3. Plaintiff State Law Claim Against Officer Comstock Should Be Dismissed

"[W]hen determining whether the force used to effect a seizure is reasonable under article

II, section 7 of the Colorado Constitution, courts should apply the 'objective reasonableness'

standard articulated in *Graham*." *Woodall v. Godfrey,* 2024 COA 42, ¶ 18 (Colo. App. 2024). As

discussed in detail in Section 2.1, Officer Comstock was chasing a felony suspect who had already

evaded other arrest attempts. ECF 6 ¶ 16, 21. Based on the stolen Ford's flight from the Aspen

Lodge, it was reasonable for Officer Comstock to believe that Plaintiff would use force to evade

arrest. Furthermore, Plaintiff's decision to run toward Airport Road made him an immediate threat

to the safety of others. Indeed, under the totality of the tense and rapidly changing circumstances,

Officer Comstock's split-second decision was reasonable. *Graham*, 490 U.S. at 396-7.[4]

### 4. Plaintiff Has Not Stated A Plausible Claim Against The City of Colorado Springs

"[U]nder § 1983, local governments are responsible only for "their *own* illegal acts."

*Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in opinion). "Where a plaintiff claims

---

[3] Plaintiff has not plausibly shown that he was on an elevated surface when he was tased. At no time relevant, was he on a surface that was above the ground. Though he alleges that he was running down a slope, he does not include facts that show the slope's height, length, or degree of incline. (ECF 6 ¶ 22). Neither has he alleged facts that show the height he fell from after being tased. *Id*. Finally, he cannot point to clearly established law that defines an elevated surface to include such a vague description of a slope. As such, he has failed to plausibly show that every reasonable officer would have understood tasing him violated the Fourth Amendment.

[4] As noted in the Complaint, Colorado law allows a peace officer to use physical force "if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the peace officer or another person." ECF 6 ¶ 82; Colo. Rev. Stat. Ann. § 18-1-707 (2022). Here, the Complaint outlines the taskforce's ineffective attempts to make an arrest with less force. ECF 6 ¶ 16, 21. Notably, it does not allege that another less forceful attempt would have succeeded. *Id*. As such, Officer Comstock did not violate Colorado law.

that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019). Therefore, to state a plausible claim against the City, Plaintiff must show that the execution of an illegal City policy inflicted his injury. *Id.* After establishing the municipal policy, "a plaintiff must demonstrate a direct causal link between the policy or custom and the injury alleged." *Id.* at 1284. Here, Plaintiff's conclusory allegations against the City do not plausibly show a custom or policy that condones a violation of any person's constitutional rights. ECF 6 ¶¶ 43-58, 90-99. Plaintiff also cannot show a "direct causal link" between his injury and any City policy. As such, his third claim should be dismissed.

### 4.1.    The Complaint Does Not Establish A Plausible Failure To Train Claim

Plaintiff's primary allegation against the City is that it fails to properly train its police officers. ECF 6 ¶¶ 44, 46-47, 49-55, 91-93, 95. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick,* 563 U.S. at 61. "[T]he City cannot be held liable for its failure to train or supervise its [police officers] unless the City's policymakers can reasonably be said to have been deliberately indifferent to the need for further training or supervision." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (10th Cir. 2010) (internal quotations omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action[.]" *Waller,* 932 F.3d at 1284 (quoting *Connick,* 563 U.S. at 61). "[A] pattern of similar constitutional violations by untrained employees is ordinarily necessary: Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have

deliberately chosen a training program that will cause violations of constitutional rights." *Waller*, 932 F.3d at 1285 (internal quotations omitted). Further, the alleged lack of training must "bear a very close causal connection to the violation of constitutional rights[.]" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring in part).

Here, Plaintiff cannot point to a single similar incident that would have instructed the City that additional taser training was needed. Indeed, Plaintiff only includes three examples, over a thirteen-year period, that involve officers deploying a taser.[5] ECF 6 ¶¶ 37, 39, 43. None of those examples allege that an officer tased a fleeing suspect, let alone one fleeing over uneven ground. *Id*. Neither do they allege that any officer failed to warn any suspect before deploying their tasers. *Id*. Because Plaintiff cannot point to factually similar cases, he cannot show the City's training program is deficient.[6] Neither can he show that the City's training program caused his specific injury. *Bauer v. City & Cnty. of Denver*, 642 F. Appx 920, 925 (10th Cir. 2016) ("[A] plaintiff

---

[5] Plaintiff's examples are distinctly different. Plaintiff's first example does not involve a taser and does not mention the crimes the officers were investigating. ECF 6 ¶ 35. Even so, he admits the officers first ordered the suspect to stop before shooting. *Id*. Plaintiff's second, seventh, and eighth examples do not involve a taser or a fleeing suspect. *Id*. ¶¶ 36, 41-42. In Plaintiff's third example, the officers, who were investigating a call about an individual with a firearm, gave the suspect, who was not running away, a clear warning before using the taser. *Id*. In Plaintiff's fourth example, which did not involve a taser or a fleeing suspect, the claims of excessive force were dismissed. *Id*. ¶ 38; *See Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1063 (D. Colo. 2021). Plaintiff's fifth example does not allege a tasing while the suspect was in flight or a failure to warn. ECF 6 ¶ 39. Plaintiff also fails to note that the Tenth Circuit granted the involved officers qualified immunity. *See Est. of Melvin, v. City of Colorado Springs*, No. 23-1070, 2023 WL 8539921, at *6 (10th Cir. Dec. 11, 2023). In the sixth example, the officers did not tase or chase the suspects. ECF 6 ¶ 40. Finally, Plaintiff's ninth example, which occurred approximately 15 years ago, does not allege a flight or a failure to warn. *Id*. ¶ 43.
[6] Plaintiff also alleges that Officer Comstock shot a man in 2021 and that the City determined that he had acted within policy limits. ECF 6 ¶ 48. Plaintiff includes no other details about this incident. The scant facts alleged do not even suggest that Officer Comstock used excessive force or that the City condoned a constitutional violation. Notably, Plaintiff does not make either allegation.

cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of [his] specific injury or that it was the moving force behind [his] deprivation.") (internal quotations omitted)). Finally, Plaintiff's inability to point to factually similar cases, prevents him from plausibly showing the City was deliberately indifferent to the need for more training. *Id*.

### 4.1.1. Plaintiff does not allege a patently obvious defect in the City's training program

"Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances, however rare, in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious." *Waller*, 932 F.3d at 1285 (internal quotations omitted). Here, Plaintiff does not identify any deficiency in, or discuss any portion of, Officer Comstock's training. Without discussing the training the City provided, Plaintiff cannot plausibly show that it was deliberately indifferent to a patently obvious defect in its taser training program. *Irizarry v. City & Cnty. of Denver*, No. 21-CV-01490-PAB-SKC, 2023 WL 2528782, at *12 (D. Colo. Mar. 15, 2023) (allegations which do not show how a police officer was trained, who trained him, or how his training is deficient, do not state a plausible claim for relief).

### 4.2. Plaintiff Has Not Shown The Existence Of A Widespread Custom

For the same reasons as stated in section 4.1, Plaintiff's single conclusory allegation that an unofficial widespread custom or practice caused his injuries is without merit. ECF 6 ¶ 45. Indeed, his inability to point to other similar examples "seriously undermines [this] claim." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (Noting that when "attempting to prove the existence of such a 'continuing, persistent and widespread' custom, plaintiffs most

commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way.").

### 4.3.    Plaintiff Has Not Shown An Official Policy Condoning Or Ratifying Excessive Force

Plaintiff's conclusory allegations that the City maintains a general policy that condones and ratifies acts of excessive force is insufficient to state a claim. ECF 6 ¶¶ 32, 52, 56, 93, 94. Indeed, these allegations present several problems for Plaintiff. First, the Complaint fails to identify any policy that condones excessive force. To the contrary, the Complaint quotes the City's use of force policy favorably.[7] *Id*. p. 1. Second, Plaintiff has not pled sufficient facts to support his ratification theory. "[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson,* 627 F.3d at 790. Here, none of Plaintiff's examples name a final policymaker, let alone claim that one approved any officer's unconstitutional act and the basis for the act. ECF 6 ¶¶ 35-43. Instead, Plaintiff simply claims that the City, CSPD, and the "Chief of Police," ratified dissimilar constitutional violations by failing to investigate, counsel, and discipline an unknown number of unnamed officers. ECF 6 ¶ 94. Plaintiff's vague and conclusory assertions fall far short of establishing a viable ratification theory. *See Rehberg v. City of Pueblo*, No. 10-CV-00261-LTB-KLM, 2012 WL 1326575, at *7 (D. Colo. Apr. 17, 2012) (finding in part that a plaintiff could not support a ratification theory by alleging an officer's acts were ratified by the town of Pueblo and the officer's "supervisory officers"). Finally, Plaintiff cannot plausibly

---

[7] The Complaint also notes that the City has a policy related to taser use. ECF 6 ¶ 84. However, Plaintiff does not allege that this policy is unconstitutional or that it causes unconstitutional behavior. *Id*.

show that such a general policy was the moving force behind his specific injury. *Martinez v. City & Cnty. of Denver*, No. 11-CV-00102-MSK-KLM, 2013 WL 5366980, at *15 (D. Colo. Sept. 25, 2013) ("A broad contention that Denver's policies encourage the use of excessive force generally is precisely the sort of generalized proof of causation that *Harris* deems insufficient.").

## <u>Conclusion</u>

WHEREFORE, for the above reasons, Defendants respectfully request that this Honorable Court enter an order dismissing Plaintiff's Complaint, in its entirety, with prejudice, and for any further relief this Court deems appropriate.

Respectfully submitted this 29th day of July, 2024.

OFFICE OF THE CITY ATTORNEY
Wynetta P. Massey, City Attorney

/s/ Brian Stewart
Brian Stewart, Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone:  (719) 385-5909
Facsimile:  (719) 385-5535
Brian.Stewart@coloradosprings.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of July, 2024, the foregoing **DEFENDANTS'**
**MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)** was filed using the CM/ECF e-filing
system, which will send notice to the following:

Tyler A. Jolly
Jolly Law, P.L.L.C.
9996 W U.S. Highway 50, Unit 1090
Salida, CO  81201

Harry M. Daniels
The Law Offices of Harry M. Daniels, LLC
4751 Best Road, Suite 490
Atlanta, GA  30337


                                        */s/ Amy McKimmey*
                                        Paralegal



# Colorado Springs Police Department
## Standard Operating Procedure

### DL-500-01 Conducted Energy Weapons (CEW)

**Section 500 – Use of Force**

Effective Date: 3/18/2021
Revision Rescinded: 8/9/2018
Last Review Date: 5/1/2020

## .01   Purpose

It is the policy of the Colorado Springs Police Department (CSPD) that officers and marshals use only the force that is reasonably necessary to effectively bring an incident under control.  A use of force must be objectively reasonable as defined in GO 500 Use of Force.

This directive provides guidelines for the proper storage, maintenance, issue, carry, and deployment of Conducted Energy Weapons (CEW). This directive further defines the appropriate use of this particular use of force tactic.  It is important to note that each trigger pull on the CEW or use of the ARC switch to energize a deployed cartridge is considered to be a separate use of force and each deployment must be objectively reasonable.

## .02   Cross Reference

GO 500 Use of Force
GO 510 Reporting Use of Force
SOP P1-126 Field Medical Clearances

## .03   Definitions

*Active Aggression:* A threat or overt act of an assault, coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is imminent. Threatening body language includes, but is not limited to, blading the body, assuming a boxer stance, circling officer or marshal's position, clenching of the hands from an open to closed position, forming a fist, etc. Active Aggression is a higher level of resistance than Active Resistance.

*Active Resistance:* Physically evasive movements to defeat an officer or marshal's attempt to control, including, but not limited to, bracing, tensing, pushing, flailing arms, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody. Active

Page **1** of **9**

Resistance also includes attempting to avoid apprehension and failing to comply with an officer or marshal's order to reveal themselves from concealment or surrender. Walking away may be considered active resistance if the person continues to walk away from an officer or marshal after having been given a lawful order or having been told the person is under arrest. Active Resistance is a higher level of resistance than Passive Resistance.

*Arming:*  Moving the safety switch of the CEW from the safe position to the armed position, activating the CEW for use/ deployment.

*Cartridge Types:*

Close Quarters (CQ) cartridge deploys at a 12-degree downward angle and is designed for use at a distance within 15 feet.

Stand Off (SO) cartridge deploys at a 3.5-degree downward angle and is designed for use at a distance greater than 11 feet but less than 25 feet.

*CEW:* Conducted Energy Weapon.

*CID:*  Central Information Display

*Deployment:* The firing of a cartridge(s) to engage a person (or small animal, i.e. such as a dog, if necessary), by contact with live probes and activation of the five-second electric pulse cycle, one or more times.

*Drive-Stun:* Deployment of the CEW in direct contact with a person or persons.

*Download:* The procedure of downloading the internal memory from the CEW, updating firmware, and resetting of the internal clock if required.  This occurs when the rechargeable battery is placed into a docking station for charging.

*Fleeing:*  Attempting to evade or avoid police contact through flight.  Flight may include, but is not limited to, running, as well as, use of a bicycle, skateboard, or other manner of conveyance.

*Laser Painting:* A technique used in conjunction with verbal commands, when the operator points the targeting lasers of the CEW on the subject's body as a visual warning of the operator's intent to use the CEW. This terminology was adopted from training practices provided and supported by AXON Enterprises.

*Passive Resistance:* Physical actions that do not prevent the officer or marshal's attempt to control, for example, a person who remains in a limp, prone position, or passive demonstrators.

*Function Test Mode:* Is a function-test to verify that the CEW functions properly.

*Warning Arc:* A sustained press of the ARC Switch on the CEW that initiates an arc across both cartridge bays without discharging the Cartridges. This technique is use in conjunction with verbal commands and is an auditory and visual warning of the operator's intent to the use the CEW.

## .04   Procedure

### Use of Conducted Energy Weapon (CEW)

The approved conducted Energy weapon for use by officers and marshals of the CSPD is AXON's TASER 7 that is yellow in color. The CEW is designed to stun and override a person's central nervous system, causing contractions of the muscle tissue, leading to temporary incapacitation.

All marshals and police officers at the rank of sergeant and below performing duty in uniform, including voluntary assignments and extra duty, will carry the approved CEW supplied by the department at all times. Lieutenants who choose to work extra duty will also carry the approved CEW during the extra duty assignment. An exception to this mandate is the Tactical Enforcement Unit, which is authorized to deploy CEW with specific officers in an operational deployment as the situation dictates.

Officers performing a non-uniformed assignment have the option of carrying the approved CEW supplied by the department.

*AUTHORIZED DEPLOYMENT OF CONDUCTED ENERGY WEAPONS*

Officers and marshals are authorized to use CEW if:

1. Officers or marshals have grounds to arrest or detain the person and the person's actions are at a level of Active  Resistance or Active Aggression and/or
2. The officer or marshal has a reasonable belief the person poses an imminent danger to themselves or others.

Please note there are limitations on this authorization, found in "Limitations on Use of CEW," below, including more stringent requirements when using CEW on a fleeing person.

*WARNING BEFORE USE OF CEW*

Before using a CEW, an officer or marshal will attempt to deescalate the situation by warning the subject of an impending use of force and give them the chance to comply with verbal orders. This

Page **3** of **9**

warning is not required when delaying the CEW discharge would be unsafe, the element of surprise is necessary to minimize the risk of harm, or is otherwise not feasible.

Officers and marshals should also consider attempting the laser painting and/or warning arc techniques, in conjunction with verbal commands, prior to discharging the CEW.

*(REDACTED)*

*LIMITATIONS ON USE OF CEW*

- Officers and marshals are prohibited from using a CEW on a driver of a running motor vehicle.

- Absent exigency or supervisory approval, officers and marshals will not deploy CEW in the following circumstances:
  - When a person is handcuffed
  - When a person is in an elevated position or a location where a fall may cause substantial injury or death
  - When near flammable liquids or fumes
  - When a person is in deep water
  - When a person is pregnant, elderly, intellectually or developmentally disabled, a young child, and/or visibly frail
  - When a person is a passenger in a running motor vehicle
  - In a drive stun mode, due to the increased likelihood of causing injury
  - In a crowd control situation
  - More than one officer or marshal deploying a CEW on the same person at the same time
  - When a person offers only passive resistance

- **Fleeing persons:** There is an increased risk of a fleeing person sustaining a serious injury as a result of a CEW application. Officers and marshals are only authorized to use CEW on a fleeing person if one or both of the following situations exist:
  1) They have probable cause to arrest the person for a misdemeanor or felony offense, and/or
  2) The officer or marshal has a reasonable belief the person poses an imminent danger to others.

As in all cases of officers' or marshals' use of force, the use of a CEW on a fleeing person must be objectively reasonable as described in GO 705 Use of Force. Even if the use of CEW is authorized on a fleeing person, officers and marshals must exercise proper judgment with its use to minimize the risk of injury to an individual falling to the ground unprotected. Officers and

Page **4** of **9**

marshals must balance the elevated injury risk with the need for immediate apprehension. If feasible, it is important in the case of a fleeing person that the officer or marshal give the person an order to stop and warn the person of the impending use of force. This allows the person an opportunity to comply before risking injury.

**Number of Times Deployed:** CEWs should be deployed no more than what is reasonably necessary to accomplish subduing a person until alternate means can be used to ensure compliance. If safe and practical to do so, officers and marshals should consider handcuffing or gaining control of the suspect while the CEW is in its 5-second cycle. Each trigger pull on the CEW or use of the ARC switch to energize a deployed cartridge is considered to be a separate use of force and this justification must be present and articulated in written reports. These separate uses of force are reported in one Blue Team report. Additional justification is required for deploying the CEW more than 3 times on a single individual.

*DEPLOYMENT CONSIDERATIONS*

Officers and marshals will give special attention to the deployment of a CEW to ensure the safety of all persons involved.

In evaluating tactical situations, marshals, officers, and supervisors will consider whether the circumstances at hand might be better addressed by specially trained and equipped personnel or units, such as the Tactical Enforcement Unit, and seek assistance from such specialized units when appropriate.

**Use on Suspects in a Prone Position:** Because TASER 7 probes spread out when fired, the angle an officer or marshal deploys the TASER 7 from becomes critical in situations where the person may be laying prone. Consider the best angle needed for target acquisition prior to deploying the TASER.

**Multiple Officer Deployment:** Caution should be used when multiple officers and/or marshals are on scene. When possible, officers and marshals should coordinate their actions to avoid multiple officers or marshals deploying CEWs at the same time.

**Aiming:** Officers and marshals should avoid aiming or firing probes at a subject's head, neck, breasts, chest area near the heart, and genitalia.

*POST-DEPLOYMENT ACTIONS*

**Reports:** As with all uses of force, officers and marshals will complete a detailed case or incident report of the event, describing the circumstances leading to the deployment of a CEW. A Blue Team Use of Force (UoF) report will be completed as required by GO 710 Reporting Use of Force.

When a CEW is discharged in the line of duty, a download will be performed prior to the officer or marshal going off duty. The information obtained from the download will be printed and a copy of the discharge record will be attached to the UoF report in Blue Team. When an officer or marshal enters a CEW use in the UoF report, a submenu will open requiring specific CEW information. This submenu will be completed as thoroughly as possible. (Exception: Officers and marshals do not need to enter the probe cartridge serial number.)

It is important to remember that the initial use of a CEW and each subsequent follow-up use, whether through a probe deployment or use of the ARC switch to energize a deployed cartridge, are independent uses of force which must be independently articulated. When repeated CEW deployments are the result of the same incident, against the same citizen, by the same officer or marshal, they will all be reported on one UoF report.

**Accidental Discharge:** All accidental firings of a CEW that strike a citizen will be documented on a Use of Force Report.

**Medical Considerations:** Following a CEW discharge, officers and marshals should avoid using a restraint technique that could impair respiration/breathing.

Following the probe/deployment of a CEW, officer(s) or marshal(s) will secure the subject and request a medical unit response. The subject must be carefully monitored following the use of CEW for signs of medical distress. If distress is observed, the officer will request the medical response to be Code 3. The officer or marshal will brief arriving medical personnel of the CEW usage on the subject. In cases where medical personnel determine that transport to a hospital is not necessary, a *Field Medical Clearance (or Refusal of Treatment)* must be obtained from an on-scene paramedic. If the subject is to be booked into jail, a copy of the Medical Clearance will accompany the arrestee and be provided to booking personnel at the jail. If the CEW probes were deployed in the subject's chest or the subject complains of chest pain, the ECG strip must also be provided to booking personnel at the jail.

**Probe Removal and Cartridge Disposal:** Only an AXON Probe Removal Tool will be utilized for probe removal. After a subject has been secured in handcuffs or other appropriate restraints, the officer(s) or marshal(s) deploying the CEW will evaluate the subject to determine if the probes have penetrated the skin. An officer or marshal may remove the probes if they have not penetrated a sensitive area (Head/Neck/Breast/ Groin). Photographs of the probe sites will be taken, prior to, and following probe removal, if possible. Officers or marshals may want the on-scene paramedics to remove the probes, while they take appropriate photographs. Only trained medical personnel will remove a probe(s) from sensitive areas.

The removed probes will be secured by inverting the probes and placing them back into the spent cartridge as demonstrated in training. The wires will be wrapped around the cartridge. Both the

probes and wires will then be secured in place by wrapping tape over the cartridge. This will prevent the sharp ends of the probe from penetrating other objects. The cartridge will then be disposed of, in a biohazard container.

In cases involving probe strikes to a sensitive area, or in critical incidents, the probes/cartridge/wires will be placed into evidence after being properly secured. When collecting the probes/wires/cartridges for evidence, avoid breaking the wires by gathering them loosely, and placing them in the appropriate container.

## Logistical Considerations

**Training and Qualifications:** Only those personnel specifically trained in their use will deploy CEWs. All officers and marshals selected will attend and successfully complete an approved course of training prior to deploying these munitions in the course of their duties. Training will include the following:

- Classroom instruction
- Scenario exercises
- Live fire exercises
- Written test(s)

Officers and marshals are required to re-qualify on an annual basis. Re-qualification courses will be developed and administered by the Training Academy and will include the firing of smart cartridges which deploy probes.

All officers and marshals receive training to understand the responsibilities of deploying a CEW - before, during, and after a deployment. Periodic training should include a review of relevant directives, de-escalation techniques, and target area considerations.

The Training Academy will maintain documentation of all CEW training.

**Method and Manner of Carry:** The CEW will be carried in an approved, specifically designed holster. The CEW will be worn on an officer or marshal's duty-belt or load bearing vest in a loaded condition. Officers must carry the CEW on the opposite side from his/her duty handgun. Officers must make a conscious choice to draw the CEW vs. their sidearm.

The CEW is not to be carried in any other manner by officers or marshals wearing the duty uniform. Officers will carry the CEW in a cross-draw position, unless prior approval is received from the officer's division commander after consultation with the Training Academy lieutenant. An officer will not draw their duty weapon and CEW simultaneously and should never have both in their hands at the same time.

Officers carrying CEW while dressed in plainclothes will wear it holstered and in a position on the opposite side in a cross-draw fashion from where their sidearm is carried. Prior approval from the officer's division commander after consultation with the training academy director is required to carry the CEW in any other manner.

**Assignment/ Return of CEWs:** All officers and marshals the rank of sergeant and below will be assigned a CEW through the Training Academy. If the department does not have enough CEWs for all officers, marshals, and sergeants, they will be allocated to uniformed officers, marshals, and sergeants first. The Taser Program Manager (usually a Master TASER Instructor) will be assigned by the Training Academy Director and will maintain a record of all of the CEW assignments to officers, patrol divisions, and specialized units. This information will also be updated and tracked through the use of Evidence.com and Quartermaster on Q.

Each patrol division and the Specialized Enforcement Division have been issued a limited number of spare CEWs to issue to officers or marshals who have a broken or malfunctioning CEW. Should an officer's CEW malfunction, a designated officer (usually a TASER instructor) in the respective division for the malfunctioning CEW will complete a Return Merchandise Authorization (RMA) and it will be sent back to AXON for repair or replacement. The spare CEW will then be assigned to the officer in Evidence.com and Quartermaster on Q. The officer assigning the spare CEW will notify the Taser Program Manager at Training Academy of the RMA and new assignment. When AXON returns or replaces the CEW, the designated person from the division will assign it as a spare in Evidence.com and Quartermaster on Q and will notify the Taser Program Manager.

**Inspection of the CEW:** Each officer and marshal, at the beginning of their shift, will inspect their CEW for any visible damage and will check the battery level and perform a test utilizing the Functional Test Mode. If damage is observed, the officer or marshal will make note of such damage to the division's assigned TASER instructor and will be assigned a spare CEW. Cartridges should also be inspected to ensure there is no apparent damage and that the expiration date remains valid.  Batteries should only be recharged when indicated by the Central Information Display (CID), and after the deployment of the CEW for download purposes.

**Functional Test Mode Procedures:**

- Ensure the weapon is on safe and is pointing in a safe direction.
- Press and release both ARC switches simultaneously.
- The CID will display firmware version and battery percentage remaining.
- Axon Signal is muted.
- Move the safety switch to the armed position and any ARC switch functions that follow will log as Functional Test Mode.
- **DO NOT PULL THE TRIGGER.  If the trigger is pulled on a loaded Taser 7, the weapon will immediately exit Functional Test Mode and deploy a cartridge.**

Page **8** of **9**

- When the weapon is placed back on safe, it will return to normal operation.

**Downloads:**

A download is mandatory as a Post-Deployment Action.  At a minimum, the battery will be replaced at least once a quarter.  For those personnel who do not carry the CEW on a daily basis, the battery will be replaced prior to going into service. The minimum time needed for just a download (not charging the battery) is 30 minutes.  Each Division/Unit will be responsible for scheduling of quarterly downloads as to maintain enough spare batteries in the docking station.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:24-cv-01293-DDD-TPO

JACOB ROOT,

     Plaintiff,

v.

OFFICER ROBERT COMSTOCK, in his individual capacity;
CITY OF COLORADO SPRINGS, a municipality,

     Defendants.

---

## ORDER GRANTING MOTION TO DISMISS

---

While running away from police, Plaintiff Jacob Root was tased by Colorado Springs Police Officer Robert Comstock and fell to the ground. In the fall, Mr. Root broke his neck and is now quadriplegic. He brings state and federal claims of excessive force against Officer Comstock and against the City of Colorado Springs for failure to adequately train its officers. *See* Dkt. 6 at 16–25. The Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 12. For the reasons below, the motion is granted.

## LEGAL STANDARD

A court's role in addressing a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the

plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir.
2007) (internal quotation marks omitted)." But "where the well-pleaded
facts do not permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged—but it has not 'show[n]'—'that
the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679
(quoting in part Fed. R. Civ. P. 8(a)(2)). "Mere 'labels and conclusions'
and 'a formulaic recitation of the elements of a cause of action' will not
suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). So, a
court can "disregard conclusory statements and look only to whether the
remaining, factual allegations plausibly suggest the defendant is liable."
*Id.* "A claim has facial plausibility when the plaintiff pleads factual con-
tent that allows the court to draw the reasonable inference that the de-
fendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## BACKGROUND

Mr. Root alleges that on May 16, 2022, "thirteen law enforcement
officers across three agencies [] were working together as part of the
"BATTLE" (Beat Auto Theft Through Law Enforcement) task force,"
which included Officer Comstock. Dkt. 6 at 3. About ten days prior, the
task force officers had received a report that an unlocked 2017 Ford Fu-
sion was stolen from a parking lot near the complaining witness's home
sometime during the night. *Id.* at 4. On May 16, members of the task
force spotted that car unoccupied in the parking lot of a Super 8 Motel
in Colorado Springs. *Id.* Rather than recover the car, "the task force
members affixed a tracking device to [it]" and later tracked it to another
hotel. *Id.* When officers arrived there, they waited for the driver to re-
turn to the car and, when he did, "attempted to block [him] from leaving
the parking lot." *Id.* The driver was able to evade the police cruisers,
however, "colliding and causing damage to [one] in the process." *Id.* At

that point, the task force officers did not pursue the car, but "later tracked [it] to a Kum & Go gas station on Airport Road in Colorado Springs" with Mr. Root inside. *Id.* at 5.

The Amended Complaint then alleges that officers observed Mr. Root "get out of his car and enter the gas station." *Id.* "While Mr. Root was in the gas station, the task force members surrounded the building and parking lot." *Id.* They then observed Mr. Root "exit[] the gas station" and "[u]pon seeing the officers, [] run past the gas pumps and towards the sidewalk on Airport Road." *Id.* As Mr. Root was running, one officer "shot at [him] with a 'Bola Wrap,'" which missed.[1] *Id.* Officer Comstock was also chasing Mr. Root on foot by this point and, while Mr. Root was "running down the elevated slope dividing the gas station from the side-walk on Airport Road," "without warning Mr. Root he would use his TASER weapon," Officer Comstock tased him in the back. *Id.* Mr. Root, who "experienced muscular incapacitation upon being shot" and "could not use his hands or arms to break his fall, fell head-first down the de-cline, across the sidewalk, and off the curb down into the street." *Id.* at 5–6. Because Mr. Root "broke his neck during the fall," he "remained face down in the street, face bloodied and groaning in agony, as officers surrounded him and placed him in handcuffs." *Id.* at 6. At the time he was tased by Officer Comstock, Mr. Root alleges that he did not have a weapon on him, did not make verbal threats that he was armed or in-tended to use force against anyone, did not use force against anyone, and was running away from police. *Id.*

The Amended Complaint also contains a number of allegations re-garding the City of Colorado Springs's "custom and practice of using and

---

[1] A Bola Wrap is a hand-held remote restraint device that deploys a Kev-lar cord to wrap around an individual's legs or arms to prevent them from moving.

ratifying excessive force":

29. It has long been the custom and actual practice of CSPD to engage in, encourage, and condone the use of excessive force by CSPD officers.

30. Colorado Springs did not terminate or discipline Defendant Comstock for his actions against Mr. Root. Further, CSPD did not recommend any further training or counseling for Defendant Comstock, despite his actions against Mr. Root.

31. Colorado Springs' and the CSPD's official position regarding the shooting of Mr. Root in the back, causing him to fall and break his neck, was and is that Defendant Comstock's actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices and training of the City of Colorado Springs and the CSPD.

32. This ratification of the conduct that caused Mr. Root's quadriplegia is not alleged as proof that this ratification itself "caused" Mr. Root's injuries. Rather, it is evidence that the conduct was engaged in pursuant to policy, custom, and practice of the CSPD.

33. Defendant Comstock acted intentionally, knowingly, willfully, wantonly, maliciously and/ or recklessly in disregard to Mr. Root's federal protected rights, and acted under the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Colorado Springs acting under color of state law.

...

45. Defendant Colorado Springs knew, based on its long history and widespread practice of its officers using excessive force and its condoning of those actions, that its officers would likely use excessive and unnecessary force against persons like Mr. Root.

...

47. Defendant Colorado Springs has a policy that trains and tolerates its officers who use excessive and deadly force, even under circumstances where the officer or a third party is not at the time in imminent risk of death or serious bodily injury.

...

49. Because Defendant Colorado Springs created and tolerated a custom of deliberate indifference and failed to adequately train and supervise CSPD officers in the constitutional use of force, individuals, like Mr. Root, have repeatedly been subjected to violations of their constitutional rights.

50. Defendant Colorado Springs fostered a policy of inaction in the face of knowledge that CSPD officers were frequently violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which is the functional equivalent of a decision by Colorado Springs itself to violate the Constitution.

…

54. CSPD's approval and defense of the use of excessive force by CSPD employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually *trains* CSPD law enforcement officers—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future.

…

57. Defendant Colorado Springs' acts or omissions caused Mr. Root damages, because he suffered quadriplegia, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

*Id.* at 7–16.

As support for the above allegations against the City, the Amended Complaint also lists alleged prior victims of the City's excessive force policies: De'Von Bailey (*Id.* at 8), Dalvin Gadson (*Id.* at 8–9), Tyrone Moss (*Id.* at 9), Michael Sexton (*Id.* at 10), Jeffrey Melvin (Id. at 10–11), Ryan and Joey Brown (*Id.* at 11), Grant Bloomquist (*Id.* at 11–12), John Sturgis (*Id.* at 12), and Douglas Sellier (*Id.* at 12–13).

## DISCUSSION

Mr. Root's first claim for relief contends the actions of Officer Comstock amount to excessive force in violation of the Fourth Amendment. *Id.* at 16–17. His second claim is based on the same conduct and alleges a violation of Colorado Constitution Article II, Section 7. *Id.* at 20–22. His third claim contends the City of Colorado Springs's "policies, customs, and practices" violated Mr. Root's rights by failing to train or supervise police officers to prevent them from using excessive force against fleeing persons. *Id.* at 22–25.

## I.    Fourth Amendment

A Fourth Amendment excessive-force claim is governed by an objective standard: "A police officer violates an arrestee's ... Fourth Amendment right to be free from excessive force during an arrest if the officer's actions were not 'objectively reasonable' in light of the facts and circumstances confronting him." *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1213 (10th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (further quotation omitted). To determine the objective reasonableness of the use of force, a court "must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). In conducting this balancing, three factors should be considered: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396) (alteration omitted). "Ultimately the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017)

(internal quotations omitted).

Even accepting Mr. Root's allegations in the Amended Complaint as true and construing them in their most favorable light, the totality of the circumstances alleged justified Officer Comstock's use of force. According to the Amended Complaint, by the time Officer Comstock was pursuing Mr. Root at the gas station on Airport Road, he had reason to suspect Mr. Root already committed two dangerous felonies—the first by stealing a car, and a second by using that car to evade pursuing police officers (and striking a police cruiser along the way). *See* Dkt. 6 at 4. This would have put all officers involved on notice that the suspect presented a credible threat to their safety and that of the public. *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent.").

When officers later confronted Mr. Root after he emerged from the gas station, he resisted arrest and proceeded to run towards a busy roadway, which created an immediate safety risk to motorists and the officers in pursuit. Dkt. 6 at 5. This too adds to the reasonableness of the use of a taser. *See Ill. v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion[.]"). One officer in pursuit then fired a Bola Wrap at Mr. Root. Though it missed, this action gave non-verbal notice of officers' attempts to use force to apprehend him. *See Palacios v. Fortuna*, 61 F.4th 1248, 1259 (10th Cir. 2023) ("[A] warning does not need to be specifically that officers are about to open fire."). When Mr. Root refused to stop and proceeded to run towards a busy roadway, Officer Comstock made a split-second decision to fire his taser at him. Dkt. 6 at 5; *see Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 761 (10th Cir. 2021) (The "calculus of reasonableness must [also] embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

No one disputes the tragedy that occurred next—Mr. Root's temporary muscular incapacitation resulting from the taser prevented him from breaking his fall, and he fell head-first down a decline, across a sidewalk, and into the street, breaking his neck and rendering him quadriplegic. Dkt. 6 at 5–6. But that devastating outcome does not factor into the analysis which must focus on what the officer knew *before* the decision to use force. *U.S. v. Madrid*, 713 F.3d 1251, 1255 (10th Cir. 2013) (The use of force analysis is an objective standard that asks whether the "facts available to the officer at the moment of the seizure would warrant a man of reasonable caution that the action taken was appropriate.") (cleaned up). And in the totality of circumstances alleged, Officer Comstock's use of force was not unreasonable. Those circumstances included a suspected felon who had struck a police vehicle while fleeing from officers, who had not responded to multiple lesser uses of force, and who was creating an apparent danger to himself and the public by running towards a busy street. Use of a taser in such circumstances was well within the bounds of options a reasonable officer might select.[2] *See Wilson v. City of Lafayette*, 510 F. Appx 775, 777 (10th Cir. 2013) (cert. denied) (Gorsuch J.) (holding that an officer's actions were

---

[2] Mr. Root claims Officer Comstock's use of a taser amounted to deadly force in violation of the Fourth Amendment and Colorado Springs Police Department's procedures. *See* Dkt. 22 at 7–16. But Mr. Root provides no details describing the elevated position he was allegedly in—nothing regarding the height he was at vis-à-vis the ground (or that he was even off the ground), or the degree of decline he was running down—and the cases he cites in support of this claim are remarkably dissimilar to the facts he alleges, *viz.*, he was not on a wall, ledge, ladder, roof, or fence off the ground. *See id.* at 9–10. The danger here was not such that using a taser was likely to cause death.

reasonable and did not amount to excessive force under the Fourth Amendment even though he tased a fleeing felon and one of the taser probes struck the suspect in the head and killed him); *Coronado v. Olsen*, No. 2:18-CV-83, 2020 WL 5821220, at *6 (D. Utah Sept. 30, 2020), *aff'd*, No. 20-4118, 2022 WL 152124 (10th Cir. Jan. 18, 2022) (finding that officers acted reasonably when they used tasers to stop the advancement of an unarmed and half naked suspect who after being tased, tragically struck his head and suffered a brain injury). Accordingly, Mr. Root's claim of excessive force in violation of the Fourth Amendment must be dismissed.

But even if one concluded Officer Comstock's conduct violates the Fourth Amendment, Mr. Root's claim would still have to be dismissed under the second prong of qualified immunity. *See Heard v. Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022) ("[T]he plaintiff must 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'") (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018). Mr. Root has not provided any cases with facts similar enough to put reasonable officers on notice that use of a taser was unconstitutional in these circumstances. And in fact, the cases show otherwise. *See, e.g., Wilson, Coronado, supra*. Under either prong of qualified immunity, the claim against Officer Comstock must be dismissed.

## II.    Municipal Liability

Under Section 1983, "local governments are responsible only for "their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277,

1284 (10th Cir. 2019). Therefore, to state a plausible claim against the City of Colorado Springs, Mr. Root must show that the execution of an illegal policy inflicted his injury. *Id.* He also "must demonstrate a direct causal link between the policy or custom and the injury alleged." *Id.* at 1284.

Mr. Root's conclusory allegations that the City maintains a general policy that condones and ratifies acts of excessive force are insufficient to state a claim on this basis. The Amended Complaint fails to identify any policy that condones excessive force, and it fails to allege the City's actual excessive force or taser policies are unconstitutional.[3] Instead, Mr. Root relies on ratification and custom or practice theories of liability. As to the former, he alleges that because the City "did not terminate or discipline Defendant Comstock for his actions, … did not recommend any further training or counseling for [him]," and found that his "actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices, and training," then it necessarily has "a custom or policy of using and ratifying excessive force." Dkt. 6 at 7. He states, "[h]ad Defendant Comstock's actions been outside of the policy, disciplinary or remedial action would have been taken." *Id.* This sort of circular reasoning is generally insufficient to establish municipal liability under a ratification theory even if the underlying action was unconstitutional. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 790 (10th Cir. 2010) ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."). But even if a lack of known discipline itself were sufficient in some cases, it is not here because the underlying actions were not unconstitutional.

---

[3] Mr. Root even appears to argue that the City's Use of Force policy was *violated* by Officer Comstock. *See* Dkt. 6 at 1.

Mr. Root also describes nine other incidents he says show the City had a custom or policy of allowing police officers to use excessive force. *See.* Dkt. 6 at 7–16. But while at this stage the Court is required to accept all well-pleaded allegations as true, it need not recognize conclusory statements predicated on dissimilar or dubious examples of excessive force. Even if nine other cases were sufficient in a city the size of Colorado Springs to show an established custom or policy, these cases are not similar enough to do so.[4] *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (noting that when "attempting to prove the existence of such a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way.").

Mr. Root's examples do not show deliberate indifference to the likelihood that force would be used unconstitutionally in these circumstances. Absent this, "the City cannot be held liable for its failure to train or supervise its [police officers because] the City's policymakers [cannot]

---

[4] The examples cited are not similar enough to create municipal liability. Mr. Root's first example does not involve a taser and does not mention the crimes the officers were investigating. Dkt. 6 at ¶ 35. And even there, the officers first ordered the suspect to stop before shooting. *Id.* Mr. Root's second, seventh, and eighth examples do not involve a taser or a fleeing suspect. *Id.* at ¶¶ 36, 41–42. In Mr. Root's third example, the officers, who were investigating a call about an individual with a firearm, gave the suspect, who was not running away, a clear warning before using the taser. *Id.* In Mr. Root's fourth example, which did not involve a taser or a fleeing suspect, the claims of excessive force were dismissed. *Id.* at ¶ 38; *see Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1063 (D. Colo. 2021). Mr. Root's fifth example does not allege a tasing while the suspect was in flight or a failure to warn. Dkt. 6 at ¶ 39. Mr. Root also fails to note that the Tenth Circuit granted the involved officers qualified immunity. *See Est. of Melvin, v. City of Colo. Springs*, No. 23-1070, 2023 WL 8539921, at *6 (10th Cir. Dec. 11, 2023). In the sixth example, the officers did not tase or chase the suspects. Dkt. 6 at ¶ 40. And Mr. Root's ninth example does not allege a flight or a failure to warn. *Id.* at ¶ 43.

reasonably be said to have been deliberately indifferent to the need for further training or supervision." *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (10th Cir. 2010). And because "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] actions that will cause violations of constitutional rights," to survive Defendants' motion to dismiss, Mr. Root must have at least alleged the City was on notice that its "course of training [with respect to tasers was] deficient in a particular respect" and directly caused Mr. Root's injury. *Waller*, 932 F.3d at 1284–85 (cleaned up); *see also Irizarry v. City & Cnty. of Denver*, No. 21-CV-01490-PAB-SKC, 2023 WL 2528782, at *12 (D. Colo. Mar. 15, 2023) (allegations which do not show how a police officer was trained, who trained him, or how his training is deficient, do not state a plausible claim for relief). He has not done so here.

Mr. Root has also not alleged facts that plausibly suggest there was an unofficial widespread custom of using excessive force. On this score, he asserts a single conclusory allegation, *see* Dkt. 6 at ¶ 45, which does not suffice to show a widespread custom. And even if the nine examples Mr. Root describes were on point, it is not clear that would suffice to create municipal liability. Higher courts have not put forward a numerical standard for how many prior cases suffice to show a pattern or practice. *Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1039 (D.N.M. 2019) (quoting *Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir. 1981) ("[T]he mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies.")). Nine is a small numerator over what would be a relatively large denominator—the number of interactions between subjects and police in a city the size of Colorado Springs over fifteen years. *Cf. Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for

establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (explaining that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"). Given this and that the nine examples are not sufficiently similar to Mr. Root's facts, he has not alleged plausible facts to show a widespread custom by the City of using excessive force. Instead, Mr. Root simply states that the City, the police department, and the chief of police "ratified the excessive force of their officers through failure to investigate, failure to counsel, and failure to discipline officers who use excessive force." Dkt. 6 at 24. Without more details, these allegations are conclusory at best and cannot serve as a basis for a claim for relief. Accordingly, Mr. Root's claim against the City of Colorado Springs is dismissed.

## III.  State Claim

Because the federal claims that were the basis for this court's jurisdiction must be dismissed, Mr. Root's state claim against Officer Comstock is also dismissed. 28 U.S.C. § 1367(c)(3); *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010).

**CONCLUSION**

It is **ORDERED** that:

Defendants' Motion to Dismiss, **Dkt. 12**, is **GRANTED** and Plaintiff's complaint is dismissed without prejudice.

DATED: March 3, 2025          BY THE COURT:

~~Daniel D. Domenico~~
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01293-DDD-TPO

JACOB ROOT,

      Plaintiff,

v.

OFFICER ROBERT COMSTOCK, in his individual capacity;
CITY OF COLORADO SPRINGS, a municipality,

      Defendants.

---

## NOTICE OF APPEAL

---

      Notice is hereby given that Jacob Root appeals to the United State Court of Appeals for the Tenth Circuit from this Court's March 3, 2025 Order (ECF 29), granting Defendants' Motion to Dismiss (ECF 12).  This Order was designated by the District Court as a Final Judgment pursuant to F.R.C.P. 58 (ECF 30).

      Respectfully submitted this 28th day of March, 2025.


/s/ Tyler A. Jolly
**Tyler A. Jolly, #52361**
Jolly Law PLLC
9996 West U.S. Highway 50, Unit 1090
Salida, CO 81201
719-429-7359
Tyler@jollylawcolorado.com

/s/ Harry M. Daniels

1

**HARRY DANIELS**
4751 Best Road
Suite 490
Atlanta, GA 30337
daniels@harrymdaniels.com
678-664-8529

Dated: March 28, 2025

CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Tyler A. Jolly tyler@jollylawcolorado.com
Harry M. Daniels daniels@harrymdaniels.com
Attorneys for Plaintiff

Brian Stewart brian.stewart@coloradosprings.gov
Attorney for Defendant Comstock

/s/ Tyler A. Jolly
Tyler A. Jolly

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Avast Security, Version 1.15 (Revised July 11, 2023)} and according to the program are free of viruses.

/s/Harry M. Daniels
Harry M. Daniels

CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April 2025, I electronically filed the above and foregoing Appendix with the Clerk of the 10th Circuit Court of Appeal by using the CM/ECF system which will send a notice of electronic filing to all registered counsel.

/s/Harry M. Daniels
Harry M. Daniels